## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## ROCK HILL DIVISION

| | | |
|---|---|---|
| TERRI KENNEDY, on behalf of herself and all others similarly situated, | ) ) | Case No.    0:21-cv-01704-SAL |
|     Plaintiffs | ) ) | Class Action Complaint |
| v. | ) ) | Demand for Jury Trial |
| NEW-INDY CATAWBA LLC and NEW-INDY CONTAINERBOARD, LLC | ) ) | |
|     Defendants. | ) | |

## CLASS ACTION COMPLAINT

COMES NOW the Plaintiff Terri Kennedy, by and through their undersigned counsel, on behalf of herself and all others similarly situated ("Plaintiffs"), who file this Class Action Complaint against Defendants.  In support of this complaint, Plaintiffs allege as follows:

## INTRODUCTION

1.     This is a wide-ranging class action seeking damages from Defendants New-Indy Catawba LLC, d/b/a New-Indy Containerboard and New-Indy Containerboard, LLC's (collectively, "New-Indy") for the egregious and wrongful emission of foul and harmful hydrogen sulfide, methyl mercaptan, methanol, and other pollutants and contaminants to the air, and the discharge of inadequately treated wastewater to the Catawba River, affecting potentially over one million citizens, residents, and workers in South Carolina and North Carolina.

2.     New-Indy's paper mill is located in Catawba, South Carolina (the "Mill").  Once known as the Resolute Forest Products paper mill, it has been in operation since 1957, and, until 2020, manufactured bleached paper used in magazines and catalogs.

3.     In 2018, New-Indy purchased the Mill to convert it from producing bleached paper to producing brown paper for containerboard.  New-Indy is a joint venture between Kraft Group,

LLC, based out of Massachusetts (the owner of the New England Patriots), and Schwarz Partners LP, based out of Indiana.

4.    New-Indy claims it "has established a perfect balance in its manufacturing process." *See* https://newindycontainerboard.com/ (last visited June 7, 2021).

5.    Based on that and other promises, in November 2019, New-Indy secured from York County, South Carolina an agreement to limit its tax rate to 4%—the rate homeowners typically pay which is much lower than what industrial users pay.  Unlike homeowners, however, New-Indy's operations can cause and have caused grave environmental damage.

6.    Unfortunately for the citizens of York County and surrounding counties, New-Indy repaid York County's generosity by engaging in conduct that has egregiously polluted the area and caused harm and damages to potentially over one million people.

7.    New-Indy has admitted in toxic release filings with the U.S. Environmental Protection Agency (the "EPA") that it emitted 31,700 pounds of hydrogen sulfide, 148,400 pounds of ammonia, and over a million pounds of methanol to the atmosphere in 2019—all before it began sending the foul wastewater to the lagoons.

8.    New-Indy completed the Mill conversion in November 2020 and began high volume production in February 2021. To facilitate the conversion, the Mill stopped sending foul condensate to a steam stripper and incinerator and instead sent all foul condensate to its open-air lagoons.  This foreseeably resulted in an eight to ninefold increase the amount of foul condensate piped to the open-air lagoons, causing a condition where hydrogen sulfide and other dangerous air pollutants and contaminants evaporated into the air and dispersed to the surrounding communities.

9.    Despite the ongoing negative effects of New-Indy's activities, on April 5, 2021, New-Indy submitted to the South Carolina Department of Health and Environmental Control

("DHEC"), an application requesting <u>the removal of a permit production limit</u>, to allow for an <u>increase</u> in the production rate from New-Indy's Mill.

10.    Upon information and belief, DHEC has not acted on that permit application nor granted New-Indy permission to increase production.

11.    As the Mill began high volume production, people living and working within a 30-mile radius of the Mill experienced and complained of strong, foul odors and physical reactions to exposure to excessive amounts of hydrogen sulfide and other pollutants and contaminants.

12.    DHEC received "an unprecedented number of complaints … related to odor," and immediately began investigating the odors. By May 7, 2021, DHEC received more than 17,000 complaints of noxious odors.

13.    On May 7, 2021, DHEC determined "the odor is injurious to the welfare and quality of life and is interfering with use and enjoyment of property" and ordered New-Indy to take actions to remedy the unlawful air pollution released from the Mill. In DHEC's order, it determined the odor is injurious to the welfare and quality of life and interfering with use and enjoyment of property in the area. *See* Exhibit A, DHEC Order.

14.    On May 13, 2021, the EPA issued an emergency order under the Clean Air Act, also ordering New-Indy to take actions to remedy the unlawful air pollution released from the Mill. *See* Exhibit B, EPA Order.

15.    New-Indy discharges up to twenty-five million gallons of wastewater per day in the Catawba River, which includes tens of thousands of pounds of ammonia and nitrate. The Catawba Riverkeeper has reported the presence of "chunky foam" in areas downstream of the New-Indy wastewater discharge since the fall of 2020, which was the same time that New-Indy began switching from making bleached paper to brown paper. In addition, the EPA had cited New-Indy

for being non-compliant with the Clean Water Act each quarter between April 1, 2020 to December 31, 2020 (the most recent quarter reported).

16.     The interim orders by DHEC and EPA do not compensate for people's past, present, and future harm caused by New-Indy's wrongful actions, and they fail to require New-Indy to take immediate and adequate measures to eliminate its pollution of the air and to stop discharging inadequately treated wastewater to the Catawba River.

17.     Plaintiffs bring this proposed class action on behalf of themselves and all other persons or entities who, from November 1, 2020 to the present (the "Class Period"), owned, leased, resided on property, or were employed within, or conducted business within, 30 miles from the Mill (the "Class Area").

## JURISDICTION AND VENUE

18.     This action seeks recovery for injuries to the Plaintiffs' and Class' health, real property, and personal property resulting from New-Indy's wrongful and tortious actions and omissions, which occurred at and around the Mill in York County, South Carolina, and caused damages to Plaintiffs in York County and the Class Area.

19.     The Court has personal jurisdiction over New-Indy because the claims asserted in this action arise from New-Indy's contacts with South Carolina.

20.     This Court has jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). CAFA jurisdiction is appropriate because there are 100 or more Class Members and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

21.     Independent of and in addition to original jurisdiction under CAFA, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of

citizenship between the parties and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00).

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to Plaintiffs' claims took place in this judicial District, and because much of the property that is the subject of this action is situated in this judicial District.

## PARTIES

### PLAINTIFF

23.    Plaintiff Terri Kennedy own and live on property located at 362 Cotton Field Road, Indian Land, South Carolina.  She lives approximately seven miles northeast from the Mill.  She, with her husband, has owned her property during the Class Period.

24.    Plaintiff, at the time of sustaining the damages complained of herein, has suffered or will suffer injuries and damages as a result of the hydrogen sulfide and other pollutants and contaminants wrongfully emitted by New-Indy.

25.    Plaintiff started noticing strong and frequent odors in January 2021.  The smell of rotten eggs seeped into their home, often waking them up in the middle of the night.  The odor would come in waves, three to five times a week.  This odor continues to reach their home multiple times per week.  The awful and unpredictable odor prevents Plaintiff from enjoying her home and property.  Plaintiff suffered health effects including headaches, bloody noses, sinus issues, and persistent nausea.  Plaintiff has sought medical treatment for these conditions.

### DEFENDANTS

26.    Defendant New-Indy Catawba LLC, d/b/a New-Indy Containerboard, is a limited liability company organized under the laws of Delaware, with its main office in Catawba, South

Carolina. It is the operator of the Mill, it is registered to do business in South Carolina, and its registered agent is Corporation Services Company, 508 Meeting Street, West Columbia, South Carolina 29169.

27.     Defendant New-Indy Containerboard, LLC is a limited liability company organized under the laws of Delaware with its main office in Ontario, California. New-Indy Containerboard, LLC is the parent of New-Indy Catawba LLC. As such, it exercises total control over all aspects of New-Indy Catawba LLC's operation of the Mill. Defendant New-Indy Containerboard, LLC's registered agent is CSC Lawyers Incorporating Services, 2710 Gateway Oaks Dr., Suite 150 N, Sacramento, CA 95833.

## FACTUAL BACKGROUND

**New-Indy Converts the Mill, Increases Production, and Changes Wastewater Management**

28.     New-Indy operates the Mill at 5300 Cureton Ferry Road in Catawba, South Carolina.

29.     A population of over one million people live within a 30-mile radius of the Mill, which includes York, Lancaster, and Chester Counties in South Carolina, and Union and Mecklenburg Counties in North Carolina.

30.     The Mill is located approximately 10 to 11 miles south and southwest of Indian Land, South Carolina and Waxhaw, North Carolina, respectively. The Catawba Indian Nation Reservation is located less than 4 miles north of the Mill.

31.     The Mill operates under Title V Operating Permit #2440-0005, an air pollution permit which was issued by DHEC on May 7, 2019, became effective on July 1, 2019, and expires on June 30, 2024. The Mill also operates under National Pollutant Discharge Elimination System (NPDES) Permit No. SC0001015, a wastewater discharge permit issued by DHEC.

32.    After applying for and receiving on July 23, 2019 a state construction permit from DHEC authorizing manufacturing conversions (Construction Permit #2440-0005-DF), New-Indy shut the Mill down between September of 2020 and November of 2020, to convert manufacturing operations from communication paper products (bleached paper) to containerboard grades (unbleached cardboard or brown paper).

33.    Prior to the conversion, New-Indy sent more than half of the volume of its foul condensate steam, which contained hydrogen sulfide, methyl mercaptan, methanol, and other pollutants, to the steam stripper.  New-Indy was using the steam stripper and incinerator to control its hazardous air emissions, which also resulted in the removal of hydrogen sulfide and other pollutants and contaminants from the Mill's air emissions.  The maximum capacity of New-Indy's steam stripper is approximately 430 gallons per minute ("gpm") of foul condensate.  New-Indy was piping the remainder of its foul condensate to the Aeration Stabilization Basin ("ASB") at a rate of approximately 90 gpm.

34.    After the conversion, when the Mill resumed manufacturing operations in November 2020 (with low production rates), and began higher (but not full) production rates in February 2021, it began sending all of its foul condensate steam to the ASB in the wastewater treatment facility at approximately 720-800 gpm, which is almost <u>twice</u> the maximum capacity of the steam stripper.  Hydrogen sulfide and other pollutants and contaminants were volatilized and emitted from the ASB to the ambient air.  This practice leads to passive air stripping of hydrogen sulfide and other pollutants and contaminants into the ambient air given the high volatility of hydrogen sulfide and the other pollutants and contaminants in the foul condensate.

35.    On April 5, 2021, despite knowing that their operations were emitting dangerous amounts of hydrogen sulfide and other pollutants and contaminants into the community, New Indy

submitted a permit application to DHEC requesting authorization to <u>increase</u> its operations, which required the removal of a permit production limit at the Mill.

**Adverse Health Effects of the Pollutants**

36.    Hydrogen sulfide is a flammable, colorless gas.  It is a component of the Total Reduced Sulfur ("TRS") chemical mixture associated with the pulp and paper industry and has a "rotten egg" odor.  People usually can smell hydrogen sulfide at low concentrations in air ranging from .5 to 300 parts per billion ("ppb").

37.    Inhalation exposures to elevated concentrations of hydrogen sulfide have been shown to cause various adverse health effects.  The Center for Disease Control ("CDC") Information Center's guidance states that exposure to low concentrations of hydrogen sulfide can cause irritation to the eyes, nose, or throat, difficulty breathing for some asthmatics, and headaches, poor memory, tiredness, and balance problems.  Pulmonary manifestations can include "bronchial and/or lung hemorrhage."

38.    Repeated or prolonged exposure to hydrogen sulfide has been reported to cause low blood pressure, headache, nausea, loss of appetite, weight loss, ataxia, eye-membrane inflammation, and chronic cough.  Neurologic symptoms, including psychological disorders, with chronic exposure pose more serious consequences to children because of the potential latency period. Exposure to hydrogen sulfide may pose additional risks to pregnant women, with "increased risk of spontaneous abortion."  "High-dose exposures may cause insufficient cardiac output, irregular heartbeat, and conduction abnormalities." *Medical Management Guidelines for Acute Chemical Exposure Hydrogen Sulfide*, https://www.atsdr.cdc.gov/mhmi/mmg114.pdf

39.    Methyl mercaptan (CASRN 74-93-1; $CH_4S$) also known as methanethiol, is a highly toxic, extremely flammable, colorless gas with a smell similar to rotten cabbage.  Methyl

mercaptan has an odor threshold of 2 ppb. Further, vapors of liquified methyl mercaptan gas are heavier than air and spread along the ground. Methyl mercaptan is highly irritant when it contacts moist tissues such as the eyes, skin, and upper respiratory tract. It can also induce headache, dizziness, nausea, vomiting, coma, and death.

40.    Epidemiological, experimental, toxicological, and other studies have investigated the relationship between inhalation exposure to hydrogen sulfide and adverse health effects. In 2010, the National Research Council of the National Academics evaluated the state-of-the-science and published AEGLs ("Acute Exposure Guideline Levels") for hydrogen sulfide. The evaluation reported three tiers of AEGLs. The AEGL-I concentrations are defined as the airborne concentration … of a substance above which it is predicted that the general population, including susceptible individuals, could experience notable discomfort, irritation, or certain asymptomatic nonsensory effects."

41.    AEGL-I concentrations are derived for different averaging periods. For hydrogen sulfide, the 10-minute, 30-minute, and 60-minute AEGL-I concentrations are 750 ppb, 600 ppb, and 510 ppb, respectively. These values were all derived from a study that reported headaches among adults with asthma following acute inhalation exposures to hydrogen sulfide.

42.    The CDC's Agency for Toxic Substances and Disease Registry (ATSDR) has established an acute Minimal Risk Level ("MRL") for hydrogen sullfide. A MRL is an estimate of the daily human exposure to a hazardous substance that is likely to be without appreciable risk of adverse health effects over a specified duration of exposure. For hydrogen sulfide, the acute MRL for continuous exposure from 1 day to 14 days is only 70 ppb. The odor threshold range for hydrogen sulfide is .5 to 300 ppb.

43.    Between April 24-27, 2021, EPA personnel took hydrogen sulfide samples from

the air at 12 locations near the New-Indy Mill, ranging in distance from 0.38 miles to 3.56 miles. One second hydrogen sulfide concentrations in the air ranged from 13.6 ppb to 943 ppb and averaged from 1.73 ppb to 669 ppb over the duration of the sampling period (30-62 minutes). Seven of the 12 samples exceeded the MRL as averaged over the sampling duration and one exceeded the AEGL for hydrogen sulfide. The EPA's findings are described in the EPA's May 13, 2021 Order, paragraphs 21-32. *See* Exhibit B.

**"Unprecedented" Complaints; Regulators Determine New-Indy is Source of Pollutants**

44.     Residents in Fort Mill, Indian Land, Rockhill, and Lancaster, South Carolina. and in Charlotte, Matthews, Pineville, and Waxhaw, North Carolina (Lancaster and York Counties in South Carolina, and Union and Mecklenburg Counties in North Carolina), have complained of strong odors emanating from the Mill and reported health effects to DHEC. DHEC's online database, which was created on March 12, 2021, allows specific information to be reported in a descriptor field. The reported health effects as of May 13, 2021 included nausea (approximately 740 complaints including those that reported exposure to a "nauseating" odor), headaches including migraines (approximately 650 complaints), nose or throat irritation (approximately 370 complaints), and eye irritation (approximately 360 complaints). Other reported symptoms include coughing, difficulty breathing, asthma "flare ups," and dizziness. As of April 27, 2021, in the approximately five weeks since the DHEC online database was created, the database received approximately 14,000 of such complaints, an "unprecedented" amount. *See* Ex. B, DHEC Order ¶5. Just over a week later, as of May 7, 2021, the total number of complaints climbed to over 17,000. Some of the complaints are from residents as far as 30 miles away from the Mill. In contrast, in all of 2020, DHEC received approximately five complaints about the Mill.

45.     Residents have also documented on DHEC's online database a wide range of

impacts to quality of life, personal comfort, and wellbeing. This includes hundreds of instances of lost sleep, a desire to stay indoors to avoid odors, and stress and anxiety. For example, as of May 13, 2021, many residents noted: that odors are noticeable inside their homes (more than 2,000 complaints); that they were woken at night due to the odors (more than 600 complaints); and that they did not want to go outside due to the odors (more than 400 complaints). A sampling of specific quality of life impacts include: "It [the odors] is preventing our ability to enjoy our home and community," "We basically cannot enjoy our life," and "We are prisoners in our own smelly home."

46.    By April 9, 2021, DHEC was actively investigating the source of the strong odors reported in York and Lancaster Counties.  DHEC personnel reported experiencing off-site odors on Highway 5, as it crosses the Catawba River near the Mill, and in neighborhoods several miles away, in Rock Hill, Lancaster, and Indian Land, South Carolina.

47.    EPA Region 4 also maintains a database to keep track of complaints submitted by residents who live near the Mill.  During March and April of 2021, the EPA logged 310 complaints. Some complaints reported odors and a subset included information on health impacts.  As of May 13, 2021, the most frequently cited symptoms included in the EPA database were headache (80 complaints), burning eyes (52 complaints), nausea (40 complaints), and throat irritation (20 complaints). These are the same four health impacts that were reported most frequently in the DHEC online database.

48.    During an onsite inspection on April 15, 2021, EPA inspectors wore 4-gas monitors for personal safety that were set to alarm at a low threshold of 10 ppm (10,000 ppb) of hydrogen sulfide. One inspector experienced the following hydrogen sulfide readings with the 4-gas monitor while onsite at the Mill:

a. At 11:07 a.m., on the top of the Post-Aeration Tank, near the guardrail overlooking the tank contents, the 4-gas monitor hydrogen sulfide alarm triggered and read 15.9 ppm (15,900 ppb).

b. At 12:41 p.m., about 50 feet from Aerator 6, the 4-gas monitor hydrogen sulfide reading was 6.9 ppm (6,900 ppb). The 4-gas monitor also read hydrogen sulfide of 3.1 ppm (3,100 ppb) at 12:49 p.m., and 4.9 ppm (4,900 ppb) at 12:52 p.m.

c. At approximately 4:47 p.m., a hydrogen sulfide alarm on the 4-gas monitor triggered while the employee was near the Evaporator Tank #1. The above 10 ppm reading wasn't recorded, but shortly after the employee left the area, the 4-gas monitor showed a reading of 6.9 ppm (6,900 ppb).

49. On April 24, 25, 26, and 27, 2021, EPA inspectors also detected hydrogen sulfide from on-site and nearby locations downwind of the Mill. The EPA's findings are described in the EPA's May 13, 2021 Order, paragraphs 21-32. *See* Exhibit B.

50. EPA inspectors reported experiencing a distinct and strong odor while at the Mill and while conducting sampling in nearby areas, including Catawba Indian Nation Reservation, Indian Land, Riverchase Estates, and other surrounding communities. The EPA inspectors reported noticing odors at the same time as when the Geospatial Measurement of Air Pollution mobile lab measured airborne hydrogen sulfide. They also reported experiencing headaches, itchy eyes, and nausea while the odor was present, and when hydrogen sulfide was being detected.

51. DHEC's analysis assessing the location of an air emitting source using odor complaints, wind direction, and EPA Region 4's May 5, 2021 report regarding the Mill identify New-Indy's Mill as the main, if not only, source of hydrogen sulfide causing the symptoms residents had reported in the surrounding communities.

52.    Many of the EPA recorded samples showed hydrogen sulfide concentrations greater than AEGL-I.  One sampling event on April 26, 2021 southeast of the Mill near the Riverchase Estates development measured a hydrogen sulfide concentration that was already greater than 750 ppb, indicating that elevated concentrations occurred for an unknown duration before the sampling period began.  *See* Exhibit B, EPA Order ¶38.

53.    Over 40 years ago, the EPA determined that sulfur compound air emissions from pulp and paper mills, like New-Indy's Mill here, can adversely affect the welfare of the public. *See* Kraft Paper Mills, Standards of Performance for New Stationary Sources, 41 Fed. Reg. 42012 (Sept. 24. 1976) ("TRS [total reduced sulfur] emissions from kraft pulp mills are extremely odorous, and there are numerous instances of poorly controlled kraft mills creating public odor problems ... Kraft pulp mills are a major source of TRS compounds ...TRS emissions from kraft pulp mills are composed primarily of hydrogen sulfide, methyl mercaptan, dimethyl sulfide and dimethyl disulfide ... TRS compounds can have an adverse effect on public welfare ... The emissions from each pulp mill surveyed in the study affect an average of 44,000 persons over an area of approximately 100 square miles ...").  At all relevant times, New-Indy was aware of the risks its operations posed.

54.    The DHEC online database reports demonstrate that residents near the Mill experience many adverse impacts beyond health affects, including the odor-related quality of life impacts alleged above.

55.    Based on Plaintiffs' own investigation and reports and data that continue to be added to DHEC's and EPA's websites, New-Indy's wrongful and egregious emissions of hydrogen sulfide and other pollutants and contaminants continue to occur on a daily if not hourly basis, causing harm and damages to the many people who live and work within 30 miles of the Mill.

## New-Indy's Wrongful Conduct

56.     If New-Indy properly designed, operated, maintained, and managed the Mill, including it wastewater treatment plant, after the conversion, the Mill's systems would collect, capture, or destroy the hydrogen sulfide and other pollutants and contaminants produced by operation of the Mill to prevent their escape into the ambient air, water, and surrounding community.

57.     New-Indy has failed to adequately collect, capture, and destroy the hydrogen sulfide and other pollutants and contaminants generated at the Mill, improperly allowing emissions of the hydrogen sulfide and other pollutants and contaminants to escape the Mill and invade the homes and properties of the Plaintiffs and the Class members, causing them harm and damages.

58.     New-Indy has a duty to control the Mill's emission of the hydrogen sulfide and other pollutants and contaminants.  As such, New-Indy must operate and maintain the Mill in a way that adequately captures, controls, and mitigates the emission of the hydrogen sulfide and other pollutants and contaminants by implementing reasonably available mitigation, elimination, and control systems.

59.     New-Indy has failed to utilize and/or employ adequate mitigation strategies, processes, and technologies to prevent and control the hydrogen sulfide and other pollutants and contaminants from escaping the boundaries of the Mill and impacting the Catawba River, the surrounding properties, and people within the Class Area.

60.     New-Indy's wrongful actions and omissions include, but are not limited to:

a)     Utilizing inadequate systems when manufacturing their products, including the mismanagement of raw ingredients and byproducts;

b)     Operating and maintaining a manufacturing process that inadequately captures,

controls, and/or mitigates the hydrogen sulfide and other pollutants and contaminants.

c)      Failing to use proper or adequate equipment to abate emissions of hydrogen sulfide and other pollutants and contaminants, such as steam strippers, incinerators, and treatment ponds;

d)      Failing to adequately treat and filter the exhaust produced through commercial operations prior to emitting it into the ambient air;

e)      Failing to develop and/or implement an adequate odor prevention and abatement plan;

f)      Failing to utilize other odor prevention, elimination, and mitigation measures and technology available to New-Indy; and

g)      Increasing production levels while knowing the Mill does not have the equipment, systems, or measures in place to adequately manage the resulting higher levels of wastes, including foul condensate that contain the hydrogen sulfide and other pollutants and contaminants.

h)      Other failures revealed during discovery.

61.      As a result, the Plaintiffs' and putative Class' properties have been, and continue to be, physically invaded by noxious odors and polluted wastewater from the Mill.

62.      These hydrogen sulfide and other pollutants and contaminants have interfered with activities in the surrounding areas, and they have precluded the use and enjoyment of private and public spaces in those areas and caused harm and damages to people within the Class Area.

## CLASS ACTION ALLEGATIONS

63.      Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23 on behalf of the following Class:

All persons or entities who, from November 1, 2020 to the present, owned, leased, resided on property, or were employed within, or conducted business within, 30 miles from the Mill (the "Class Area")."

Excluded from the Class are (1) New-Indy; (2) any entity in which New-Indy has a controlling interest; (3) any person with an ownership interest in New-Indy; (4) any current or former officer or director of New-Indy; (5) any current or former employee of New-Indy for any potential exposure during their employment by New-Indy; (6) persons who have entered into separate settlement agreements with New-Indy related to claims similar to those claims made in this action; and (7) the legal representatives, successors, or assigns of New-Indy.

64.     Plaintiffs reserve the right to revise the Class definition based on facts learned while litigating this matter.

65.     This action is proper for Class treatment under Fed. R. Civ. P. 23.  While the exact number and identities of other Class members are unknown to Plaintiffs at this time, Plaintiffs are informed and believe that there are many thousands of Class members.  Over one million people live within 30 miles of the Mill.  Thus, the Class members are so numerous that individual joinder of all Class members is impracticable.

66.     Common questions of law and fact arise from New-Indy's conduct described herein.

67.     Such questions are common to all Class members and predominate over any questions affecting individual Class members. These include:

a.     New-Indy's production of hydrogen sulfide and other noxious air and water pollutants and contaminants, and New-Indy's release of those pollutants and contaminants into the ambient air and the Catawba River;

b.      New-Indy's violation of applicable federal and state laws, regulations, and permits relating to hydrogen sulfide and other noxious air and water pollutants and contaminants;

c.      Findings and determinations made by the EPA regarding New-Indy's operation of the Mill;

d.      Finding and determinations made by DHEC regarding New-Indy's operation of the Mill;

e.      Enforcement actions by EPA and by DHEC against New-Indy;

f.      Whether New-Indy's actions constitute actionable misconduct as set forth in this complaint;

g.      Whether, and to what extent, injunctive relief should be imposed on New-Indy's to prevent such conduct in the future;

h.      Whether, and to what extent, Class members have suffered and continue to suffer damages that include contamination of their air and water, requiring upgrades, changes, and additions to the Mill's wastewater treatment facilities, property, methods, testing, monitoring, and operations, as well as remediation of all affected air and water.

i.      Whether the Class members have sustained damages as a result of New-Indy's wrongful conduct; and

j.      The appropriate measure of damages or other relief.

68.     Plaintiff's claims are typical of those of the Class members because Plaintiff and the other Class members sustained damages arising out of the same wrongful conduct, as detailed herein.  Plaintiff and Class members sustained similar injuries arising out of New-Indy's wrongful conduct. The injuries of the Class members were caused directly by New-Indy's wrongful conduct.

69.     In addition, the factual background of New-Indy's misconduct is common to all

Class members and represents a common misconduct resulting in injury to all Class members. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of Class members and are based on the same legal theories.

70.     Plaintiff will fairly and adequately represent and pursue the interests of the Class. Plaintiff understand the nature of her claims herein, has no disqualifying conditions, and will vigorously represent the interests of the Class members. Neither Plaintiff nor Plaintiffs' counsel have any interests that conflict with or are antagonistic to the interests of the Class members.

71.     Plaintiff has retained competent and experienced environmental class action attorneys to represent her interests and those of the Class members. Plaintiff and Plaintiffs' counsel have the necessary financial resources to litigate this class action adequately and vigorously. Plaintiff and counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for them.

72.     The prerequisites of maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(1) are met, as the prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings or incompatible standards of conduct for New-Indy. Additionally, individual actions may be dispositive of the interest of all members of the Class, although certain Class members are not parties to such actions.

73.     The prerequisites of maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(2) are met, as New-Indy has acted and refused to act on grounds that apply generally to the Class as a whole, and Plaintiffs seek, inter alia, equitable remedies with respect to the Class as a whole. As such, final injunctive and declaratory relief with respect to New-Indy is appropriate for the Class as a whole.

74.     The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(3)

are met, as questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. It is desirable for the efficiency of the parties and the Court to concentrate the litigation of the claims in this forum and provide for single adjudications of common issues. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE PER SE**

75.    Each and every allegation of this complaint is incorporated herein as fully as if repeated verbatim.

76.    New-Indy has negligently violated South Carolina's "Pollution Control Act," South Carolina Code § 48-1-90(A)(1), § 48-1-100(A), § 48-1-110(a)(e), § 48-1-130, the Federal Clean Air Act, the Federal Clean Water Act, related federal and state regulations, and related federal and state permits.

77.    Negligence per se is warranted when a plaintiff can prove that 1) a defendant owed a duty of care arising from a statute, and 2) that the defendant violated the statute.

78.    As to the first prong, Plaintiffs must prove a duty of care through the following: a) that the essential purpose of the statute is to protect Plaintiffs from the kind of harm Plaintiffs have suffered; and b) that Plaintiff are members of the class of persons the statute is intended to protect.

79.    S. C. Code § 48-1-20 establishes the "[d]eclaration of public policy" for Title 48, the "Pollution Control Act", to "maintain reasonable standards of purity of the air and water resources of the State, consistent with the public health, safety and welfare of its citizens", as well as "the protection of physical property and other resources . . ."

80.    S. C. Code § 48-1-90 expressly prohibits and makes it unlawful to "discharge into

the environment of the State organic or inorganic matter, including sewage, industrial wastes, and other wastes, except in compliance with a permit issued by the department."

81.    S. C. Code § 48-1-100(A) expressly prohibits New-Indy from "mak[ing] a new outlet or source", and/or "increase the quality of discharge from existing outlets or sources", of "air contaminants" into the "ambient air of the State", without first making an application to DHEC for "a permit to discharge from the outlet or source."

82.    S. C. Code § 48-1-110(a)(e) expressly prohibits New-Indy from "directly or indirectly, negligently or willfully, to discharge[ing] any air contaminant or other substance in the ambient air that shall cause an undesirable level."

83.    S. C. Code § 48-1-130 expressly prohibits New-Indy, as a "person discharging . . . other waste or air contaminant into the environment of the State, in such a manner or quantity as to cause pollution", from continuing to "discharge upon receipt of an order of the department", regardless of whether "the conditioned discharge has been by virtue of a permit issued by the department".

84.    S. C. Code § 48-1-110 (2) makes it unlawful for any person to, until plans thereof have been submitted to and approved by the department and a written permit thereof shall have been granted to make any change in, addition to or extension of any existing disposal system of part thereof that would materially alter the method or the effect of treating or disposing of the sewage, industrial wase and other waters.

85.    S. C. Code § 48-1-110 (3) makes it unlawful for any person to, until plans thereof have been submitted to and approved by the department and a written permit thereof shall have been granted, to operate such new disposal systems or new source, or any existing disposal system or source.

86.     S. C. Code § 48-1-110 (3) makes it unlawful for any person to, until plans thereof have been submitted to and approved by the department and a written permit thereof shall have been granted to increase the load through existing outlets of sewage, industrial water, or other wastes into the waters of the State.

87.     S. C. Code § 44-55-80 expressly prohibits "contamination" of a water system that renders it "inoperable or unusable."

88.     The Act's purpose, as defined by S. C. Code § 48-1-20,  of "maintain[ing] reasonable standards of purity of the air",  protecting the "public health, safety and welfare of its citizens" and, "the protection of physical property and other resources" is clearly to prevent the harm that Plaintiffs have suffered—the inability to breathe the air at their homes, and in their communities, without risk to their health, safety and welfare, and the destruction of their enjoyment of their property and other resources,

89.     Since the Plaintiffs are members of the public that utilize the air covered by the Act and its subparts, as well as the Federal Clean Air Act and Clean Water Act, related federal and state regulations, and federal and state permits, they are clearly protected.

90.     Therefore, New-Indy owed and continues to owe Plaintiffs and the affected families a duty of care not to contaminate their air and water, the most basic of human necessities and resources, and a duty not to contaminate the air and waters of the States of South Carolina and North Carolina.

91.     New-Indy has clearly breached this duty of care by failing to halt the production of containerboard, cardboard, brown paper, white paper, and other materials that produce hazardous, irritating, noxious, corrosive, sensitizing, odorous, extremely flammable and contaminating substances into the air, water, and surrounding environment. Instead, New-Indy has continued its

increased production of its products to continue their increase in profits; consequently, the second element of negligence *per se* is satisfied.

92.    New-Indy has further clearly breached its duty of care by (1) discharging pollutants, contaminants, and/or other harmful substance(s) into the ambient air and waterways that cause an undesirable level; (2) discharging into the environment of the State organic or inorganic matter, that is outside of compliance with a permit issued by DHEC; (3) making a new outlet or source and/or increasing the discharge from existing outlets or sources of air and water pollutants, contaminants, and other harmful substances into the ambient air and waters of the State, without first making an application to do so to DHEC; (4) failing to halt the discharge of air and water pollutants, contaminants, and other harmful substances into the environment of the State, in such a manner or quantity as to cause pollution; (5) violating federal laws including the Clean Air Act and Clean Water Act and related regulations; and (6) violating its federal and state permits; consequently, the second element of negligence *per se* is further satisfied.

93.    Defendant is liable under negligence *per se* for violating the Act, federal laws including the Clean Air Act and Clean Water Act and related regulations, and its federal and state permits.

94.    New-Indy has failed to cure its wrongful conduct.

95.    New-Indy has continued to operate its new outlet and/or increased discharge from existing outlets into the ambient air and waters of the State, without making an application and receiving the required permits to do so.

96.    Plaintiffs are entitled to recover general, special, and punitive damages as a result of the negligence *per se* arising from New-Indy's conduct.

## SECOND CAUSE OF ACTION
## NEGLIGENCE, GROSS NEGLIGENCE, RECKLESSNESS, & WILLFUL CONDUCT

97.     Each and every allegation of this complaint is incorporated herein as fully as if repeated verbatim.

98.     New-Indy is liable for common law negligence by polluting and contaminating the community, area, and region in which Plaintiffs live, work, visit, frequent, and/or otherwise enjoy.

99.     Negligence requires: (1) a duty, (2) breach of that duty, (3) proximate causation, and (4) injury.

100.     New-Indy has been designated as the discharging source of undesirable level of air and water pollutants and contaminants, and as responsible party for the contamination at the community, area, and region in which Plaintiffs live, visit, frequent, and/or otherwise enjoy, and as such, New-Indy knew or should have known that its failure to use reasonable care in controlling, monitoring, maintaining and operating the Mill and in collecting, using, storing, disposing of, and causing to be disposed of chemicals, pollutants, contaminants and other harmful  substances, would create and has created actual harm to the persons, animals, and lands of others, including from the foul condensate stream to the ASB in the wastewater treatment facility and the environment in and around the site.

101.     New-Indy knew or should have known that there existed and still exists, a certainty of harm to others, including Plaintiffs, that would result from the disposing, discharging, depositing, releasing, and allowing the release of these chemicals, pollutants, contaminants, and other harmful substances, from the foul condensate stream of waste water into the ambient air, water, and the environment in and around the community, area, and region in which Plaintiffs live, work, visit, frequent, and/or otherwise enjoy.

102.     At all times material herein, New-Indy was under a duty to act with due and

reasonable care as imposed by law.

103.    At all times relevant, New-Indy had the strictest duty of care to conduct itself in safe and reasonable manner.

104.    New-Indy violated its duty of care negligently by failing to act with reasonable care by operating the Mill and preventing the pollution and contamination.

105.    New-Indy violated its duty of due care, and said violation was grossly negligent, willful and wanton, reckless, and calculated to cause grievous bodily harm to human beings and property, including Plaintiffs, with New-Indy conscious of how its conduct invaded Plaintiffs' rights and would likely cause the foreseeable and resulting injuries and damages.

106.    Plaintiffs have in the past and will in the future sustain damages as a result of New-Indy's negligence, gross negligence, willful and wantonness, and recklessness in failing to prevent the contamination of the air and waters of the State by negligently failing to contain and properly remediate the pollutants, contaminants, and other harmful substances.

107.    As a proximate result of aforesaid carelessness and negligence of New-Indy, the aforesaid conduct caused severe injury to Plaintiffs and thereby proximately caused Plaintiffs to sustain damages and injuries as herein alleged.

108.    New-Indy had and still has a clear duty to prevent the pollution and contamination, to subsequently ameliorate the effects of the pollution and contamination in the community and waters of the State, and lastly, to prevent further and continuing pollution and contamination of Plaintiffs' air and waters of the State.

109.    New-Indy knew that their increased production, production changes, facility modifications, and other operational changes would result in increased hydrogen sulfide emissions from the Mill into the air and the increased discharge of wastewater into the Catawba River.

110.    New-Indy knew that their current steam stripper was insufficient to handle the concentrations of foul condensate being produced by New-Indy's production, production changes, facility modifications, and other operational changes.

111.    However, New-Indy has failed to act with the due care owed to Plaintiffs and the community, area, and region in which Plaintiffs live, work, visit, frequent, and/or otherwise enjoy, and Plaintiffs and others affected in the same manner are still suffering as a result.

112.    Plaintiffs are entitled to recover general, special, and punitive damages as a result of the negligence, gross negligence, willful and wantonness, and recklessness of New-Indy's acts and omissions.

## THIRD CAUSE OF ACTION
## TRESPASS

113.    Each and every allegation of this complaint is incorporated herein as fully as if repeated verbatim.

114.    New-Indy has created a continuing trespass on Plaintiffs' property through the air and water contamination, yet it has chosen not to cease, minimize, decrease, or safely and reasonably remediate the damage caused, and instead allowed the contamination to continue, increase and spread.

115.    A trespass is any intentional invasion of a plaintiff's interest in the exclusive possession of his property.

116.    A trespass is continuing when it is intermittent or periodical, despite abatement that is reasonable and practicably possible.

117.    Plaintiffs' air and water has been invaded by hazardous, irritating, noxious, corrosive, sensitizing, odorous, extremely flammable and contaminating chemical substances which make the air unusable and potentially dangerous to Plaintiffs and others in the affected area.

118.    New-Indy's failure to remediate, cease or mitigate the trespass has only led to the further and constant strain upon Plaintiffs and others in the affected area enjoyment of their full property rights and value.

119.    Plaintiffs are entitled to recover general, special, and punitive damages as a result of the trespass arising from New-Indy's acts and omissions.

**FOURTH CAUSE OF ACTION**
**NUISANCE**

120.    Each and every allegation of this complaint is incorporated herein as fully as if repeated verbatim.

121.     New-Indy's invasion of Plaintiffs' property has created a continuing nuisance.

122.    A nuisance is a substantial and unreasonable interference with a Plaintiffs' use and enjoyment of his property.

123.    The definition of a nuisance occurs wherever acts or conditions are subversive of public order, decency, or morals, or constitute an obstruction of public rights.

124.    A nuisance is undoubtedly public when it affects the entire community or neighborhood, as is the case here, and a nuisance is continuing when it is intermittent or periodical despite possible abatement.

125.    Plaintiffs' properties and the public in the Class Area, through the exposures in the air and water, have been contaminated by the aforementioned discharges, releases, and emissions of pollutants, contaminants, and other harmful substances by New-Indy.

126.    The contamination of Plaintiffs' properties and the public in the Class Area, and air and water with pollutants, contaminants, and other harmful substances, constitutes an unreasonable and substantial invasion of Plaintiffs' use and enjoyment of their properties in that they can no longer use and enjoy their properties and air for the same purposes and to the same extent as they

could prior to the contamination caused by New-Indy.

127.    The pollution and contamination constitute a nuisance, which has resulted in the injuries and damages to Plaintiffs and Plaintiffs' properties described herein.

128.    New-Indy has maintained a condition on Plaintiffs' properties that is an illegal burden and/or servitude on Plaintiffs' properties.

129.    New-Indy's wrongful actions in the creation of the pollution and contamination, maintenance of their land, unlawful discharge to waters of the State, and failure to reasonably abate, minimize, or remediate the contamination to said air and water, resulting in migration of contamination on to Plaintiffs' properties has and continues to injure and/or annoys Plaintiffs, interfering with their use and enjoyment of their property, legal rights, and quality of life.

130.    Such wrongful acts by New-Indy in the maintenance and use of its land and failure to remediate the contamination was and is a foreseeable and proximate cause of injury, discomfort, annoyance, inconvenience, and/or damage to Plaintiffs, themselves, and their property.

131.    New-Indy's conduct is the legal and actual cause of the intentional, unreasonable, negligent, and/or reckless invasion of Plaintiffs' interests in the private use and enjoyment of their property.

132.    Plaintiffs are entitled to recover general, special, and punitive damages as a result of the nuisance arising from New-Indy's acts and omissions.

**FIFTH CAUSE OF ACTION**
**PRELIMINARY AND PERMANENT INJUNCTION**
**TO CEASE POLLUTION AND REMEDIATE THE ENVIRONMENT**

133.    Each and every allegation of this complaint is incorporated herein as fully as if repeated verbatim.

134.    An injunction should issue to prevent New-Indy from producing, releasing, spraying, emitting, dispersing, discharging, or otherwise engaging in conduct that causes a release or emission of hydrogen sulfide and other pollutants, contaminants, and harmful substances into the Class Area in which Plaintiffs live, work, visit, frequent, and/or otherwise enjoy, by entering an Order requiring New-Indy:

a.    To immediately cease and desist, or substantially reduce, the production of containerboard and other paper products;

b.    To immediately cease and desist the production, release, spray, emission, discharge and/or dispersion of hydrogen sulfide and other pollutants, contaminants, and harmful substances from the Mill into the air and/or water surrounding, in, or adjacent to the Class Area in which Plaintiffs live, work, visit, frequent, and/or otherwise enjoy;

c.    To immediately become compliant with any and all applicable federal, state, and local laws, regulations, permits, licenses, and orders related to of the production, release, spray, emission, discharge and/or dispersion of hydrogen sulfide and other pollutants, contaminants, and harmful substances into the air and/or water surrounding, in, or adjacent to the Class Area in which Plaintiffs live, work, visit, frequent, and/or otherwise enjoy;

d.    To immediately make, perform, conduct, or otherwise engage in any and all the construction and/or renovations to the Mill necessary to become compliant with any and all applicable federal, state, and local laws, statutes, ordinances, regulations, permits, licenses, and orders related to of the production, release, spray, emission, discharge and/or dispersion of hydrogen sulfide and other pollutants, contaminants, and harmful substances into the air and/or water surrounding, in, or adjacent to the Class Area in which Plaintiffs

live, work, visit, frequent, and/or otherwise enjoy, and to correct, remedy, cease, and counteract all pollution and contamination caused by the Mill's operation to date; and

    e.     To perform any other act or action that the discovery may reveal to address New-Indy's conduct causing pollution and contamination by the Mill's operations.

135.    To obtain an injunction, Plaintiffs must demonstrate that the relief requested is reasonably needed to preserve the parties' rights during the litigation and that they (1) would suffer irreparable harm if the injunction is not granted; (2) that they will likely succeed on the merits of the litigation; and (3) there is an inadequate remedy at law.

136.    Plaintiffs will suffer irreparable harm if an injunction does not issue in that they will:

    a.     Continue to suffer any and law adverse health effects caused by New-Indy's production, release, spray, emission, discharge and/or dispersion of hydrogen sulfide and other pollutants, contaminants, and harmful substances into the air and/or water surrounding, in, or adjacent to the Class Area in which Plaintiffs live, work, visit, frequent, and/or otherwise enjoy; and

    b.     Continue to suffer the loss of the use and enjoyment of their property caused by New-Indy's nuisance and trespass related to the Mill's production, release, spray, emission, discharge and/or dispersion of hydrogen sulfide and other pollutants, contaminants, and harmful substances into the air and/or water surrounding, in, or adjacent to the Class Area in which Plaintiffs live, work, visit, frequent, and/or otherwise enjoy.

137.    Plaintiffs will likely succeed on the merits of their claim because:

    a.     New-Indy is liable under negligence *per se* for violating the Act, federal laws including the Clean Air Act, Clean Water Act, and related regulations, and its federal

and state permits;

b.     As a result of New-Indy's negligence, gross negligence, willful and wantonness, and recklessness in failing to prevent the pollution and contamination of the State's air and waters used by Plaintiffs and by negligently failing to contain and properly remediate the source of such pollution, Plaintiffs have sustained damages and injuries as herein alleged;

c.     New-Indy's pollution and contamination constitutes a nuisance, which has resulted in the injuries and damages to Plaintiffs and Plaintiffs' properties described herein;

d.     New-Indy has engaged in an intentional, unreasonable, negligent, and/or reckless invasion of Plaintiffs' interests in the private use and enjoyment of their property, constituting a trespass as described herein; and

138.    Absent a Court Order enjoining New-Indy's conduct, Plaintiffs have no adequate remedy to immediately prevent New-Indy from the producing, releasing, spraying, emitting, discharging and/or dispersing hydrogen sulfide and other pollutants, contaminants, and harmful substances into the air and/or water surrounding, in, or adjacent to the Class Area in which Plaintiffs live, work, visit, frequent, and/or otherwise enjoy, as legal relief in the form of money damages is insufficient to prevent New-Indy from continuing its conduct.

## ECONOMIC DAMAGES AND PROPERTY DAMAGE

139.    Each and every allegation of this complaint is incorporated herein as fully as if repeated verbatim.

140.    Plaintiffs at all times herein mentioned, had interest or title in their properties and the right to quiet and useful enjoyment thereof, as well as their surrounding living environment, including the air and water.

141.    As a direct and proximate result of the wrongful conduct of New-Indy, pollutants, contaminants, and other harmful substances have infiltrated and irreparably damaged Plaintiffs' interest in their properties.

142.    As a direct and proximate result of said wrongful conduct, Plaintiffs have suffered economic damages including, but not limited to, the loss of use of property, denial of useful and quiet enjoyment of property, diminution in the fair market value of the property, impairment of the salability of property, property damage, and losses related to the pollution and contamination, all of which have caused said property to be stigmatized.

## **PERSONAL INJURY AND FEAR OF ILLNESS**

143.    Each and every allegation of this complaint is incorporated herein as fully as if repeated verbatim.

144.    As a further direct and proximate result of said wrongful conduct, Plaintiffs have suffered, and will continue to suffer, pain, discomfort, anxiety, fear, worries, stress, and mental and emotional distress, in an amount to be set forth according to proof at trial.

145.    Plaintiffs are informed, believe, and therefore allege that they have and/or will suffer personal injury and medical expenses due to their exposure to the contaminated air and water.

146.    The levels of certain pollutants and contaminants, including hydrogen sulfide and methyl mercaptan, invaded the air and water in the community, area, and region in which Plaintiffs live, work, visit, frequent, and/or otherwise enjoy, ultimately contaminating the air and water, have been medically proven to lead to certain types of illness.

147.    Plaintiffs have been and continue to be exposed to such illness-causing pollutants and contaminants through breathing and being generally exposed to the contaminated air and

water.

148.    Plaintiffs' emotional stress, worries, and anxieties about developing illness due to New-Indy's tortious conduct are proven to be reasonable, and thus, compensable.

## REMEDIATION

149.    Each and every allegation of this complaint is incorporated herein as fully as if repeated verbatim.

150.    As a direct and proximate result of the wrongful conduct of New-Indy, Plaintiffs have suffered and continue to suffer damages that include contamination of Plaintiffs' air and water, requiring upgrades, changes, and additions to the Mill's wastewater treatment facilities, property, methods, testing, monitoring, and operations, as well as remediation of all affected air and water.

## LOSS OF ENJOYMENT OF LIFE

151.    Each and every allegation of this complaint is incorporated herein as fully as if repeated verbatim.

152.    Damages for the loss of enjoyment of life are separate and apart from pain and suffering damages and compensate Plaintiffs for limitations on their ability to participate in and derive pleasure from the normal activities of "daily life" or their inability to pursue "talents, recreational interests, hobbies, or avocations."  In the past, courts have held that the diminishment of pleasure resulting from the loss of use of one of the senses qualifies as loss of the enjoyment of life. *See Boan v. Blackwell* 343 S.C. 498, 501 (S.C. 2001).

153.    As a result of New-Indy's aforementioned tortious conduct, Plaintiffs cannot safely breathe the air around them; they cannot experience, enjoy, or use the water around them; they cannot go about their normal lives; and they cannot live on and enjoy their homes, property, yards,

and the outdoors as a result because they are subject to toxic, noxious odors, and do not have clear, clean air or water.

154.    As a direct and proximate result of New-Indy's conduct alleged herein, Plaintiffs have lost the enjoyment of residing in their own homes, as well as living in and enjoying their communities and environment.

## **PRAYER FOR RELIEF**

Accordingly, Plaintiffs request the following relief:

1.    Injunctive relief as stated in the Fifth Cause of Action;

2.    Diminution in value of Plaintiffs' properties;

3.    Costs associated with the cleanup of Plaintiffs' properties and restoring them to a condition free of contamination;

4.    Past and future out of pocket expenses in procuring air filtering, air cleaning, water filtering, and water supply services, products, and resources;

5.    Past and future physical pain and suffering, disease, and illness;

6.    Past and future reasonable and necessary medical expenses;

7.    Reasonable and necessary expenses for medical monitoring;

8.    Full compensation for the inconvenience, annoyance, and damage to Plaintiffs' quality and enjoyment of life;

9.    Past and future mental suffering associated with the fear, stress, and anxiety arising out of the increased risk of developing illness and disease in the future as a result of Plaintiffs exposure to pollutants, contaminants, and other harmful substances;

10.    Past and future mental suffering associated with the fear of contracting illness;

11.    Punitive damages as provided by law;

12.     Pursuant to Fed. R. Civ. P. 23, certification of the proposed Class and designation of Plaintiffs as representatives of the proposed Class and Plaintiffs' counsel as Class Counsel; and

13.     Any and all other damages which have arisen or may arise in the future which are presently unnamed.

## JURY DEMAND

Plaintiffs respectfully demands a trial by jury on all issues raised in the Complaint, pursuant to Fed. R. Civ. P. 38.

**DATED:** June 8, 2021                              Respectfully submitted,

                                         ELROD POPE LAW FIRM

                                         /s/ Ben P. Leader
                                         Ben P. Leader
                                         District Court ID # 11923
                                         Elrod Pope Law Firm
                                         P.O. Box 11091
                                         Rock Hill, SC 29731
                                         803-324-7574
                                         bleader@elrodpope.com

                                         /s/ Thomas E. Pope
                                         Thomas E. Pope
                                         District Court ID # 4947
                                         Elrod Pope Law Firm
                                         P.O. Box 11091
                                         Rock Hill, SC 29731
                                         803-324-7574
                                         tpope@elrodpope.com

                                         /s/ Leonidas Stavrinakis
                                         Leonidas E. "Leon" Stavrinakis
                                         District Court ID # 6552
                                         Stavrinakis Law Firm
                                         1 Cool Blow Street, Suite 201
                                         Charleston, SC 29403
                                         843-724-1060
                                         leon@lawleon.com

Philip C. Federico
Brent P. Ceryes
*Pro Hac Vice Applications to be Submitted*
Schochor, Federico and Staton, P.A.
1211 St. Paul Street
Baltimore, Maryland 21202
410-234-1000
pfederico@sfspa.com

Chase T. Brockstedt
Stephen A. Spence
*Pro Hac Vice Applications to be Submitted*
Baird Mandalas Brockstedt, LLC
1413 Savannah Road, Suite 1
Lewes, Delaware 19958
302-645-2262
chase@bmbde.com

*Attorneys for Plaintiffs and the Class*