EXHIBIT A



By USPS and Electronic Mail

Tony Hobson
Vice President of Manufacturing
New Indy Containerboard
3500 Porsche Way, Suite 150
Ontario, CA 91764

Re:  New-Indy Catawba LLC - Determination of Undesirable Levels - Order to Correct Undesirable Level of Air Contaminants

Dear Mr. Hobson,

Enclosed please a Determination of Undesirable Levels - Order to Correct Undesirable Level of Air Contaminants issued to New-Indy Catawba LLC, 5300 Cureton Ferry Road, Catawba, SC and dated May 7, 2021.  Please note all requirements and deadlines.

Sincerely,

Renee G. Shealy, Chief
Bureau of Environmental Health Services

ec:   Myra C. Reece, Director, Environmental Affairs

Enclosures

THE STATE OF SOUTH CAROLINA
BEFORE THE DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL

IN RE:  NEW-INDY CATAWBA, LLC

YORK COUNTY

DETERMINATION OF UNDESIRABLE LEVELS

ORDER TO CORRECT
UNDESIRABLE LEVEL OF AIR CONTAMINANTS

**PLEASE TAKE NOTICE:**

New-Indy Catawba, LLC, ("New-Indy") operates a kraft pulp and paper mill located at 5300 Cureton Ferry Rd, Catawba, SC, in York County ("Facility).  The South Carolina Department of Health and Environmental Control ("Department" or "DHEC") has determined the Facility is a source of an undesirable level of air contaminants of such  quantity, characteristics and duration as to be injurious to human health or welfare or which unreasonably interfere with enjoyment of life or use of property.

This determination is based on the following:

1. The Facility operates under Title V Operating Permit #2440-0005 that was issued on May 7, 2019, became effective on July 1, 2019, and expires on June 30, 2024. New-Indy was issued Construction Permit #2440-0005-DF on July 23, 2019, in accordance with state and federal air quality regulations and standards, to allow the Facility to modify its processes to convert from bleached paper production to brown paper production. The construction permit was revised on May 13, 2020, to allow the Facility to hard pipe its condensates to the wastewater treatment plant. 40 CFR 63, Subpart S, allows this hard piping as a compliance option. The Facility reported to DHEC that it began to make brown paper on February 1, 2021.

2. The MACT standard allows hard piping of all the condensates to wastewater treatment plant as a compliance option.  New-Indy projected in its construction permit application that the Facility modifications and other operational changes could result in an increase in hydrogen sulfide emissions from the Facility. The projected increase in hydrogen sulfide emissions provided by New-Indy was below the "significant net increase" threshold as outlined in S.C. Regulation 61-62.5, Standard 7, and therefore allowed DHEC to issue a minor construction air permit for the change.

3.    Hydrogen sulfide is a flammable, colorless gas. It is a component of Total Reduced Sulfur (TRS) chemical mixture associated with the pulp and paper industry and has a "rotten egg" odor. People usually can smell hydrogen sulfide at low concentrations in air ranging from 0.0005 to 0.3 parts per million (ppm). The Center for Disease Control (CDC) Information Center guidance states that exposure to low concentrations of hydrogen sulfide may cause irritation to the eyes, nose, or throat, difficulty in breathing for some asthmatics and may also cause headaches, poor memory, tiredness, and balance problems.

4.    In February, after receiving odor complaints of noxious, foul smelling odors in York and Lancaster counties, in the vicinity of the Facility, described as rotten egg and chemical odors, DHEC immediately began an investigation to determine the source of the odors.

5.    By early March 2021, the number of odor complaints from Lancaster, York and adjoining North Carolina counties increased dramatically. On March 12, 2021, DHEC set up a public web page to provide updates on its odor investigation and provided a form for residents to report the location of and description of observed odors. To date, DHEC has received more than 17,000 complaints of noxious odors from persons living in York and Lancaster counties in South Carolina and in North Carolina. This is an unprecedented number of complaints received by the agency related to odor.

6.    Complaints indicate the odor is injurious to the welfare and quality of life and is interfering with use and enjoyment of property. There are many reports of injurious health impacts such as reports of headaches, nausea, skin and eye irritation caused by the air contaminants and noxious odors. It has also been reported that symptoms subside when either the odor subsides, or the person leaves the area where the odor is located.

7.    DHEC staff have also observed strong, offsite, foul odors in the vicinity of the Facility and several miles away from the Facility that are characteristic of hydrogen sulfide emissions from kraft pulp and paper facilities. On February 22, 23 and 24, 2021, the Department conducted air, wastewater and landfill inspections at the Facility, and has continued its odor investigation to date. DHEC has also investigated other possible sources of odor in the York and Lancaster area, including other air emissions sources, wastewater treatment plants and regulated landfills in the vicinity.

8.    As part of its investigation, DHEC conducted a back-trajectory analysis to determine whether the Facility or other area facilities were the source of contaminants causing the odor issues in the vicinity of York and Lancaster counties in South Carolina, and adjoining areas of North Carolina. A back-trajectory analysis is used to track the origin of air masses and establish source-receptor relationships. Using meteorological data, the study traces parcels of air from where odors are reported back to the source.

9.    In DHEC's back trajectory study, the Facility was located near, directly in, or under the upstream air trajectory on 25 of the 34 back trajectories that were analyzed. Based on the

information collected during the ongoing odor investigation and back trajectory analysis, DHEC did not identify other significant sources of the reported odors and determined that the Facility was the significant source of the noxious odors reported in the York and Lancaster area.

10. In a letter to the New-Indy dated April 7, 2021, DHEC notified New-Indy as follows:

> Based on the results of our investigation, it appears that New-Indy Catawba LLC located at 5300 Cureton Ferry Road, Catawba, SC 29704 is a significant contributor to the reported odors in the York and Lancaster area. At this time, we have not identified any other significant sources of the reported odors. While regulatory compliance determinations based on the inspections are still pending, we respectfully request that New-Indy Catawba LLC fully evaluate its operations and identify and take corrective actions on any potential sources that could be contributing to the odors currently being investigated in York and Lancaster counties.

> The wastewater treatment plant processes should be evaluated to determine if operation and maintenance of the system is appropriate based on the current operations. The attached wastewater inspection report identifies several deficiencies that should be addressed immediately. The facility's manuals and plans should be updated to reflect current operations and updated documents submitted by April 20, 2021. This includes the odor abatement plan.

> On March 26, 2021, we requested information related to current sludge management operations at the facility. You submitted October 2014 and March 2017 documents in response to this request. Please provide recent information that addresses current sludge management including but not limited to how you are facilitating the proper operations of the wastewater system and a description of how you are moving the legacy containing sludge to lagoon 4 and meeting the obligations under the Voluntary Cleanup Contract.

> The recent modifications related to the shut-down of the air stripper and the hard piping of the foul condensate tank to the WWTP at the facility should be evaluated to determine if they are contributing to the odors in the community....

> Additionally, the recent change in operation from making bleached paper to brown paper appears to have increased the overall TRS and

H2S emissions from the facility. Any increases in stack emissions, changes in operation of pollution control equipment, and any uncontrolled emissions should be evaluated to determine if these changes are contributing to the odors in the community.

11.    On April 16, 2021, New-Indy submitted a letter to DHEC stating that it had retained a consultant to conduct an "expedited screening analysis" during the periods of March 16 through 18 and 23 through 25, 2021. This report was submitted on April 16, 2021; however, no full evaluation of the Facility's operations was submitted to DHEC.  Though requested by DHEC's April 7 letter, New-Indy has not updated its operating manuals and plans to reflect current operations.

12.    New-Indy's failure to update its odor abatement plan when it initiated modified operations from bleached paper production to brown paper production may be in contravention of its wastewater permit.  The Facility's National Pollutant Discharge Elimination System (NPDES) Permit No. SC0001015 includes the following provision:

3.    Odor Control Requirements

The permit holder shall use best management practices normally associated with the proper operation and maintenance of a sludge wastewater treatment site, any sludge storage or lagoon areas, transportation of sludges,  and all other related activities to ensure that an undesirable level of odor does not exist.

a.    In accordance with R.61-9.504.50 (Odor Control Requirements were added to Regulation 61-9 on December 26, 2003), the permittee shall prepare an odor abatement plan for the industrial sludge treatment sites, any sludge storage or lagoon areas, and land application or land disposal sites. The permittee has one year from the effective date of this permit to prepare the plan.

(1)    Operation and maintenance practices which are used to eliminate or minimize undesirable odor levels in the form of best management practices for odor control;
(2)    Use of treatment processes for reduction of undesirable odors;
(3)    Use of setbacks;
(4)    Contingency plans and methods to address odor problems for the different type of disposal/application methods used.

    b.    The Department may review the odor abatement plan for compliance with R.61-9.504.50. The Department may require changes to the plan as appropriate.

    c.    The permittee shall not cause, allow, or permit emission into the ambient air of any substance or of substances in quantities that an undesirable level of odor is determined to result unless preventative measures of the type set out below are taken to abate or control the emission to the satisfaction of the Department. Should an odor problem come to the attention of the Department through field surveillance or specific complaints, the Department may determine, in accordance with section 48-1-120 of the Pollution Control Act, if the odor is at an undesirable level by considering the character and degree of injury or interference to:

        (1)    The health or welfare of the people;

        (2)    Plant, animal, freshwater aquatic, or marine life;

        (3)    Property; or

        (4)    Enjoyment of life or use of affected property.

    d.    Should the Department determine that an undesirable level of odor exists, the Department may require:

        (1)    The permittee to submit a corrective action plan to address the odor problem,

        (2)    Remediation of the undesirable level of odor within a reasonable timeframe, and

        (3)    In an order, specific methods to address the problem.

    e.    If the permittee fails to control or abate the odor problems addressed in this section within the specified timeframe, the Department may revoke disposal/application activities associated with the site or the specific aspect of the sludge management program.

    f.    **The odor abatement plan shall be updated and maintained as necessary throughout the life of the permit.** (emphasis added).

13.    On April 24-27, the US Environmental Protection Agency (EPA) conducted geospatial monitoring of hydrogen sulfide near the Facility to identify sources of the odor in the nearby vicinity. EPA data confirms concentrated levels of hydrogen sulfide were detected on-site and off-site downwind from the facility. This validates the determination that the Facility is a source of noxious air contaminants at undesirable levels.

14.    In correspondence dated May 5, 2021, New-Indy informed DHEC of steps taken to address the issues being discussed with the Department. To ensure prompt action by New-Indy to correct the undesirable levels of air contaminants, DHEC is issuing this corrective Order.

**WHEREAS**, Section 48-1-10(18) of the South Carolina Pollution Control Act, defines an "Undesirable level" as the "presence in the outdoor atmosphere of one or more air contaminants or any combination thereof in sufficient quality and of such characteristics and duration as to be injurious to human health or welfare, or to damage plant, animal or marine life, to property or which unreasonably interfere with enjoyment of life or use of property."

**WHEREAS**, Section 48-1-120 of the South Carolina Pollution Control Act, Determination and correction of undesirable level, provides:

> If the Department shall determine that an undesirable level exists, it shall take such action as necessary to control such condition.
>
> The Department shall grant such time as is reasonable for the owner or operator of a source to correct the undesirable level, after taking all factors into consideration that are pertinent to the issue.
>
> In making its order and determinations, the Department shall take into consideration all the facts and circumstances bearing upon the reasonableness of the emissions involved including, but not limited to:
>
> (a)   The character and degree of injury to, or interference with, the health and physical property of the people;
> (b)   The social and economic value of the source of the undesirable levels;
> (c)   The question of priority of location in the area involved; and
> (d)   The technical practicability and economic reasonableness of reducing or eliminating the emissions resulting from such source.
>
> If the undesirable level is not corrected within the required time, then the Department shall issue an order to cease and desist from causing such emissions.

**WHEREAS**, based upon the facts set forth herein and taking into account all the considerations required by Section 48-1-120, the Department has determined that undesirable levels of air contaminants from operations of the Facility exist, such undesirable levels are injurious to human health or welfare or are unreasonably interfering  with enjoyment of life or use of property, and such undesirable levels must be corrected.

**IT IS THEREFORE ORDERED THAT** New-Indy shall complete the following to ensure the prompt correction of undesirable air contaminants:

1. On or before May 17, 2021, develop a plan to provide expeditious public notification to the Department and surrounding communities prior to conducting any activities onsite that may increase odors offsite, even if the activities are intended to ultimately reduce odors.

2. On or before May 17, 2021, update and submit to the Department for approval the Notification of Intent to Conduct Performance Testing and Test Protocol to comply with 40 CFR 63, Subpart S, dated April 14, 2021, for the condensate collection and treatment system to reflect the restart of the steam stripper and to modify the sampling methods to include methanol, hydrogen sulfide (H2S) and methyl mercaptan. The updated notification, test protocol and test report must be submitted to Michael Shroup at shroupmd@dhec.sc.gov. This test must be completed no later than July 31, 2021, to comply with 40 CFR 63, Subpart S.

3. On or before June 1, 2021, complete an evaluation conducted in consultation with a nationally recognized organization, such as the National Council for Air and Stream Improvement (NCASI), to fully evaluate the current operations and processes at the Facility to identify all potential sources that could be contributing to the odors and elevated levels of H2S on and off Facility property. The evaluation must include the recent change in operation from making bleached paper to brown paper, the wastewater treatment plant operations, the recent modifications related to the steam stripper and the hard piping of the foul condensate tank to the wastewater treatment plant, any increases in stack emissions, any changes in operation of pollution control equipment, and any uncontrolled emissions to determine if these changes are contributing to the odors in the vicinity of the Facility.

4. On or before June 1, 2021, submit to the Department for approval a Quality Assurance Project Plan (QAPP) to conduct onsite and offsite H2S monitoring. Coordinate development of the QAPP with the Department to agree on the monitoring objectives. Implement the QAPP upon Department approval. Submit the QAPP to David Graves at gravesda@dhec.sc.gov. Operate and maintain air monitoring stations and associated data collection equipment for hydrogen sulfide (H2S) at representative locations as approved by the Department. New-Indy shall allow the Department access to the monitors to collect data and to data collected by New-Indy.

5. On or before June 1, 2021, submit to the Department for approval a site-specific test plan to conduct stack or vent testing to verify estimated increases in air emissions from making the switch from bleached paper to brown paper and restarting the steam stripper. This test plan shall detail all testing methods to be used to perform testing and evaluation of total reduced sulfur (TRS), H2S, and sulfur dioxide (SO2) emissions. New-Indy shall coordinate with Bureau of Air Quality (BAQ) to be onsite to observe all tests. Testing shall be commenced by June 15, 2021 and completed by June 30, 2021. Tests shall include TRS, H2S, and SO2 emission from the following stacks or vents to verify emission estimates:

   - Paper machine 2 and 3 vents
   - Kraft non condensable gases (NCG) system including evaporator sets

- Pulp dryer
- Steam Stripper inlet and outlet and combustion boiler outlet

Within fifteen (15) days after completion of the stack and vent testing and condensate sampling outlined above, conduct a facility-wide air dispersion modeling analysis for TRS, H2S and SO2 emissions.  Include area source modeling for possible fugitive emission sources and wastewater pond, basins, and other wastewater systems.  All test notifications, protocols and test reports shall be submitted to Michael Shroup at shroupmd@dhec.sc.gov.

6. On or before June 15, 2021, submit to the Department a report of the evaluation conducted in Step 3 above and, for review, comment, and approval; a corrective action plan (CAP) (developed and stamped by a South Carolina-registered Professional Engineer (PE)) and a schedule of implementation, which addresses operational issues identified in the above-referenced evaluation as contributing to the odor. The schedule of implementation shall include specific dates or timeframes for initiation and the completion of each action and details as to how each action addresses the odor and operational issues noted above.  The schedule of implementation of specific corrective action steps proposed under the CAP will be evaluated by the Department and comments provided to New-Indy within five calendar days.  New-Indy shall address all comments by the Department and submit a final approvable CAP within five calendar days of Department comment.  Upon Department approval, the schedules(s) and corrective actions contained within the CAP shall be incorporated into and become an enforceable part of this Order.

7. On or before June 15, 2021, and to the extent not included in Step 6 above, submit to the Department, for review, comment and approval, a corrective action plan (CAP) (developed and stamped by a South Carolina-registered Professional Engineer (PE)) and a schedule of implementation, which addresses operational issues at the Facility wastewater treatment plant that may be causing or contributing to odor and elevated levels of H2S. This CAP shall include, but not be limited to, a comprehensive evaluation of the wastewater treatment plant to determine if adequate and appropriate facultative waste treatment is occurring in the aerated stabilization basin (ASB) and the potential for odors resulting from the discharge of foul condensate into the wastewater treatment plant. The CAP shall address the significant fiber and sludge accumulation and foam occurring in the ASB and identify their respective source(s).  Additionally, the CAP shall include a study of the microbial concentration in the ASB to determine if there is an adequate microbial population to aid in the reduction of foam on the ASB. The schedule of implementation shall include specific dates or timeframes for initiation and the completion of each action and details as to how each action addresses the odor and wastewater treatment system operational issues noted above.  The schedule of implementation of specific corrective action steps proposed under the CAP will be evaluated by the Department and comments provided to New-Indy within five calendar days.  New-Indy shall address all comments by the Department and submit a final approvable CAP within five calendar days of Department comment.  Upon Department approval, the schedules(s) and corrective actions contained within the CAP shall be incorporated into and become an enforceable part of this Order.

8.     On or before the close of business each Friday submit a written weekly update regarding the implementation of this Order to Renee Shealy at shealyrg@dhec.sc.gov.

9.     Allow unrestricted access to Department personnel or contractors for oversight of all activities.

10.    Unless otherwise noted herein, the Department's point of contact for all matters related to this Order will be:

> Renee Shealy
> 2600 Bull Street
> Columbia, SC 29201
> 803-896-8994
> shealyrg@dhec.sc.gov

**IT IS FURTHER ORDERED** that failure to comply with this Order may subject New-Indy to further action by the Department pursuant to its authority under the Pollution Control Act, S.C. Code Ann. 48-1-10 *et seq*. The Department reserves all authority to take administrative, civil, emergency, or other action, including imposition of penalties, related to the operation of the Facility, including, but not limited to, matters addressed herein.

**IT IS FURTHER ORDERED** that the execution date of this Order is the date this Order is signed by the Director of Environmental Affairs.

**AND IT IS SO ORDERED.**

**SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL**

By _Myra Q. Reece_____
    Myra Reece, Director, Environmental Affairs

DATE: _May 7, 2021_____

**South Carolina Board of Health and Environmental Control**

**Guide to Board Review**

**Pursuant to S.C. Code Ann. § 44-1-60**

The decision of the South Carolina Department of Health and Environmental Control (Department) becomes the final agency decision fifteen (15) calendar days after notice of the decision has been mailed to the applicant, permittee, licensee and affected persons who have requested in writing to be notified, unless a written request for final review accompanied by a filing fee in the amount of $100 is filed with Department by the applicant, permittee, licensee or affected person.

Applicants, permittees, licensees, and affected parties are encouraged to engage in mediation or settlement discussions during the final review process.

If the Board declines in writing to schedule a final review conference, the Department's decision becomes the final agency decision and an applicant, permittee, licensee, or affected person may request a contested case hearing before the Administrative Law Court within thirty (30) calendar days after notice is mailed that the Board declined to hold a final review conference. In matters pertaining to decisions under the South Carolina Mining Act, appeals should be made to the South Carolina Mining Council.

I.   **Filing of Request for Final Review**

1.   A written Request for Final Review (RFR) and the required filing fee of one hundred dollars ($100) must be received by Clerk of the Board within fifteen (15) calendar days after notice of the staff decision has been mailed to the applicant, permittee, licensee, or affected persons. If the 15th day occurs on a weekend or State holiday, the RFR must be received by the Clerk on the next working day. RFRs will not be accepted after 5:00 p.m.
2.   RFRs shall be in writing and should include, at a minimum, the following information:
     - The grounds for amending, modifying, or rescinding the staff decision;
     - a statement of any significant issues or factors the Board should consider in deciding how to handle the matter;
     - the relief requested;
     - a copy of the decision for which review is requested; and
     - mailing address, email address, if applicable, and phone number(s) at which the requestor can be contacted.
3.   RFRs should be filed in person or by mail at the following address:
          South Carolina Board of Health and Environmental Control
          Attention: Clerk of the Board
          2600 Bull Street
          Columbia, South Carolina 29201
     Alternatively, RFR's may be filed with the Clerk by facsimile (803-898-3393) or by electronic mail (boardclerk@dhec.sc.gov).
4.   The filing fee may be paid by cash, check or credit card and must be received by the 15th day.
5.   If there is any perceived discrepancy in compliance with this RFR filing procedure, the Clerk should consult with the Chairman or, if the Chairman is unavailable, the Vice-Chairman. The Chairman or the Vice-Chairman will determine whether the RFR is timely and properly filed and direct the Clerk to (1) process the RFR for consideration by the Board or (2) return the RFR and filing fee to the requestor with a cover letter explaining why the RFR was not timely or properly filed. Processing an RFR for consideration by the Board shall not be interpreted as a waiver of any claim or defense by the agency in subsequent proceedings concerning the RFR.
6.   If the RFR will be processed for Board consideration, the Clerk will send an Acknowledgement of RFR to the Requestor and the applicant, permittee, or licensee, if other than the Requestor. All personal and financial identifying information will be redacted from the RFR and accompanying documentation before the RFR is released to the Board, Department staff or the public.
7.   If an RFR pertains to an emergency order, the Clerk will, upon receipt, immediately provide a copy of the RFR to all Board members. The Chairman, or in his or her absence, the Vice-Chairman shall based on the circumstances, decide whether to refer the RFR to the RFR Committee for expedited review or to decline in writing to schedule a Final Review Conference. If the Chairman or Vice-Chairman determines review by the RFR Committee is appropriate, the Clerk will forward a copy of the RFR to Department staff and Office of General Counsel. A Department response and RFR Committee review will be provided on an expedited schedule defined by the Chairman or Vice-Chairman.
8.   The Clerk will email the RFR to staff and Office of General Counsel and request a Department Response within eight (8) working days. Upon receipt of the Department Response, the Clerk will forward the RFR and Department Response to all Board members for review, and all Board members will confirm receipt of the RFR to the Clerk by email. If a Board member does not confirm receipt of the RFR within a twenty-four (24) hour period, the Clerk will contact the Board member and confirm receipt. If a Board member believes the RFR should be considered by the RFR Committee, he or she will

1

respond to the Clerk's email within forty-eight (48) hours and will request further review. If no Board member requests further review of the RFR within the forty-eight (48) hour period, the Clerk will send a letter by certified mail to the Requestor, with copy by regular mail to the applicant, permittee, or licensee, if not the Requestor, stating the Board will not hold a Final Review Conference. Contested case guidance will be included within the letter.

*NOTE: If the time periods described above end on a weekend or State holiday, the time is automatically extended to 5:00 p.m. on the next business day.*

9. If the RFR is to be considered by the RFR Committee, the Clerk will notify the Presiding Member of the RFR Committee and the Chairman that further review is requested by the Board. RFR Committee meetings are open to the public and will be public noticed at least 24 hours in advance.

10. Following RFR Committee or Board consideration of the RFR, if it is determined no Conference will be held, the Clerk will send a letter by certified mail to the Requestor, with copy by regular mail to the applicant, permittee, or licensee, if not the Requestor, stating the Board will not hold a Conference. Contested case guidance will be included within the letter.

## II. Final Review Conference Scheduling

1. If a Conference will be held, the Clerk will send a letter by certified mail to the Requestor, with copy by regular mail to the applicant, permittee, or licensee, if not the Requestor, informing the Requestor of the determination.
2. The Clerk will request Department staff provide the Administrative Record.
3. The Clerk will send Notice of Final Review Conference to the parties at least ten (10) days before the Conference. The Conference will be publically noticed and should:
   - include the place, date and time of the Conference;
   - state the presentation times allowed in the Conference;
   - state evidence may be presented at the Conference;
   - if the conference will be held by committee, include a copy of the Chairman's order appointing the committee; and
   - inform the Requestor of his or her right to request a transcript of the proceedings of the Conference prepared at Requestor's expense.
4. If a party requests a transcript of the proceedings of the Conference and agrees to pay all related costs in writing, including costs for the transcript, the Clerk will schedule a court reporter for the Conference.

## III. Final Review Conference and Decision

1. The order of presentation in the Conference will, subject to the presiding officer's discretion, be as follows:
   - Department staff will provide an overview of the staff decision and the applicable law to include [10 minutes]:
     - Type of decision (permit, enforcement, etc.) and description of the program.
     - Parties
     - Description of facility/site
     - Applicable statutes and regulations
     - Decision and materials relied upon in the administrative record to support the staff decision.
   - Requestor(s) will state the reasons for protesting the staff decision and may provide evidence to support amending, modifying, or rescinding the staff decision. [15 minutes] *NOTE: The burden of proof is on the Requestor(s)*
   - Rebuttal by Department staff [15 minutes]
   - Rebuttal by Requestor(s) [10 minutes]
     Note: Times noted in brackets are for information only and are superseded by times stated in the Notice of Final Review Conference or by the presiding officer.
2. Parties may present evidence during the conference; however, the rules of evidence do not apply.
3. At any time during the conference, the officers conducting the Conference may request additional information and may question the Requestor, the staff, and anyone else providing information at the Conference.
4. The presiding officer, in his or her sole discretion, may allow additional time for presentations and may impose time limits on the Conference.
5. All Conferences are open to the public.
6. The officers may deliberate in closed session.
7. The officers may announce the decision at the conclusion of the Conference or it may be reserved for consideration.
8. The Clerk will mail the written final agency decision (FAD) to parties within 30 days after the Conference. The written decision must explain the basis for the decision and inform the parties of their right to request a contested case hearing before the Administrative Law Court or in matters pertaining to decisions under the South Carolina Mining Act, to request a hearing before the South Carolina Mining Council.. The FAD will be sent by certified mail, return receipt requested.
9. Communications may also be sent by electronic mail, in addition to the forms stated herein, when electronic mail addresses are provided to the Clerk.

**The above information is provided as a courtesy; parties are responsible for complying with all applicable legal requirements.**

2