EXHIBIT B

# Exhibit A

Clean Air Act Emergency Order, *In re New-Indy Cataba, LLC d/b/a New-Indy Containerboard* (EPA Reg'l Dir. May 11, 2021)



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

May 13, 2021

## SENT VIA ELECTRONIC MAIL

Mr. Tony Hobson
Vice President of Manufacturing
New Indy Catawba, LLC d/b/a/ New Indy Containerboard
5300 Cureton Road
Catawba, South Carolina 29704
tony.hobson@new-indycb.com

Re: Clean Air Act Section 303 Emergency Order

Dear Mr. Hobson:

Pursuant to Section 303 of the Clean Air Act, 42 U.S.C. § 7603, the U.S. Environmental Protection Agency is issuing the enclosed Emergency Order (Order), requiring New Indy Containerboard to comply with the requirements of said Order, at its facility located at 5300 Cureton Ferry Road in Catawba, York County, South Carolina.

If you have any questions regarding this matter, please contact Todd Russo, Chief, Air Enforcement Branch, at (404) 562-9194 or by email at russo.todd@epa.gov, or have your attorney contact Marirose J. Pratt, at (404) 562-9023 or by email at pratt.marirose@epa.gov.

Sincerely,

John Blevins
Acting Regional Administrator

Enclosures

cc:
Daniel Mallett, Environmental Manager
New Indy Containerboard
dan.mallett@new-indycb.com

Pete Cleveland, Technical Manager
New Indy Containerboard
pete.cleveland@new-indycb.com

Rhonda B. Thompson, Chief
Bureau of Air Quality, SC DHEC
thompsrb@dhec.sc.gov

Micheal Abraczinskas, Director
Division of Air Quality, NC DEQ
Michael.abraczinskas@ncdenr.gov

Leslie Rhodes, Division Director
Mecklenburg County Air Quality, LUESA
Leslie.rhodes@mecklenburgcountync.gov

Scott Hansen, Environmental Director
Catawba Indian Nation
Scott.hansen@catawba.com

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 4**

| | |
|---|---|
| In the matter of | ) |
| | ) |
| **New-Indy Catawba, LLC d/b/a** | ) |
| **New-Indy Containerboard**. | ) |
| | ) |
| 5300 Cureton Ferry Road | ) |
| Catawba, South Carolina 29704 | ) |
| | ) |
| Respondent. | ) |
| | ) |
| Proceeding under Section 303 of | ) |
| the Clean Air Act, 42 U.S.C. § 7603 | ) |

**CLEAN AIR ACT
EMERGENCY ORDER**

## STATEMENT OF AUTHORITY

This emergency order ("Order") is issued to New-Indy Catawba, LLC ("Respondent") pursuant

to the authority granted to the Administrator of the United States Environmental Protection Agency

("EPA") by Section 303 of the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7603, to protect public

health or welfare, or the environment. The authority to issue this Order has been delegated by the

Administrator of EPA to the Regional Administrator for EPA Region 4 ("Regional Administrator") by

Delegation No. 7-49. This Order is issued by the Regional Administrator.

Section 303 of the Act provides that:

[T]he Administrator, upon receipt of evidence that a pollution source or
combination of sources (including moving sources) is presenting an imminent and
substantial endangerment to public health or welfare, or the environment, may bring suit on
behalf of the United States in the appropriate United States district court to immediately restrain
any person causing or contributing to the alleged pollution to stop the emission of air pollutants
causing or contributing to such pollution or to take such other action as may be necessary. If it is
not practicable to assure prompt protection of public health or welfare or the environment by
commencement of such a civil action, the Administrator may issue such orders as may be
necessary to protect public health or welfare or the environment. Prior to taking any action under
this section, the Administrator shall consult with appropriate State and local authorities and
attempt to confirm the accuracy of the information on which the action proposed to be taken is
based. Any order issued by the Administrator under this section shall be effective upon issuance

and shall remain in effect for a period of not more than 60 days, unless the Administrator brings an action pursuant to the first sentence of this section before the expiration of that period. Whenever the Administrator brings such an action within the 60-day period, such order shall remain in effect for an additional 14 days or for such longer period as may be authorized by the court in which such action is brought.

## PARTIES BOUND

1.   This Order applies to and is binding upon Respondent, its officers, directors, employees, agents, trustees, receivers, successors, assigns, and all other persons, including but not limited to firms, corporations, limited liability companies, subsidiaries, contractors, consultants, and lessees acting under or on behalf of Respondent in connection with the implementation of this Order.

2.   Respondent shall be responsible and liable for conducting the activities specified pursuant to this Order, regardless of who performs the activities. Respondent shall be liable for the conduct of employees, agents, contractors, consultants, or lessees to satisfy the requirements of this Order.

3.   No change in the ownership of the facility affected by this Order or the ownership or corporate status of Respondent shall in any way alter, diminish, or otherwise affect the responsibilities of Respondent under this Order. Respondent shall provide a copy of this Order to any successor(s) during the pendency of this Order.

## FINDINGS OF FACT

The Regional Administrator makes the following Findings of Fact:

4.   Prior to issuing this Order, EPA consulted with representatives of the State of South Carolina's Department of Health and Environmental Control ("DHEC"), of York County, South Carolina, and of Mecklenburg County, North Carolina to confirm the accuracy of the information upon which this Order is based.

5.   Respondent is a limited liability corporation registered to do business in South Carolina.

6.   Respondent operates a pulp and paper mill located at 5300 Cureton Ferry Road in Catawba, South Carolina (the "facility"). A population of approximately 1,696,019 people live within a 30-mile

2

radius of the facility, which includes portions of York, Lancaster, and Chester Counties in South Carolina, and Union and Mecklenburg Counties in North Carolina.

7.    The facility is located approximately 10-11 miles south and south west of Indian Land, South Carolina and Waxhaw, North Carolina, respectively. The Catawba Indian Nation Reservation is located less than 4 miles north of the facility.

8.    After applying for and receiving on July 23, 2019, a state construction permit authorizing manufacturing conversions (Construction Permit # 2440-0005-DF), the Respondent shut the facility down between September of 2020 and November of 2020, to convert manufacturing operations from communication paper products (bleached paper) to containerboard grades (unbleached cardboard or brown paper).

9.    Prior to the conversion, Respondent sent more than half of the volume of its foul condensate stream, which contained hydrogen sulfide, methyl mercaptan, methanol, and other chemicals, to the steam stripper. Respondent was using the steam stripper and incinerator to control its hazardous air emissions, which also resulted in the removal of hydrogen sulfide and other chemicals from facility air emissions. The Respondent was piping the remainder of its foul condensate to the Aeration Stabilization Basin ("ASB") at a rate of approximately 90 gallons per minute ("gpm").

10.    After the conversion, when the facility resumed manufacturing operations in November 2020 (with low production rates), and began higher (but not full) production rates in February 2021, it began sending all of its foul condensate stream to the ASB in the wastewater treatment facility (at approximately 720-800 gpm), where hydrogen sulfide, methyl mercaptan, methanol and chemicals can be volatilized and emitted to the ambient air. This practice is likely to lead to passive air stripping of hydrogen sulfide into the ambient air given the high volatility of hydrogen sulfide.

11. On April 5, 2021, DHEC received a permit application from the Respondent requesting the removal of a permit production limit to allow for an increase in the production rate at the facility. DHEC has not yet acted on that permit application.

12. Hydrogen sulfide is a flammable, colorless gas that smells like rotten eggs. People usually can smell hydrogen sulfide at low concentrations in ambient air ranging from 0.0005 to 0.3 parts per million ("ppm") (0.5 to 300 parts per billion ("ppb")).

13. Inhalation exposures to elevated concentrations of hydrogen sulfide have been shown to cause various adverse health effects. These include, but are not limited to, headache, nausea, difficulty breathing among people with asthma, and irritation of the eyes, nose, and throat. Whether effects occur and their severity depends on the magnitude of exposure, the duration of exposure, and the frequency of exposure.

14. Residents in Fort Mill, Indian Land, Rockhill, and Lancaster, South Carolina, and in Charlotte, Matthews, Pineville, and Waxhaw, North Carolina (Lancaster and York Counties in South Carolina, and Union and Mecklenburg Counties in North Carolina), have complained of strong odors emanating from the facility and reported health effects to DHEC. In DHEC's online database, which was created on March 12, 2021, and allows specific information to be reported in a descriptor field, the reported health effects have included nausea (approximately 740 complaints, including those that reported exposure to a "nauseating" odor), headaches including migraines (approximately 650 complaints), nose or throat irritation (approximately 370 complaints), and eye irritation (approximately 360 complaints). Less frequently reported symptoms include coughing, difficulty breathing, asthma "flare ups," and dizziness. As of April 27, 2021, in the approximately five weeks since the DHEC online database was created, the database received approximately 14,000 such complaints, some from residents as far as 30 miles away from the facility. In all of 2020, DHEC received approximately five complaints about the facility.

4

15. Residents have also documented on DHEC's online database a wide range of impacts to quality of life, personal comfort, and wellbeing. This includes hundreds of instances of lost sleep, a desire to stay indoors to avoid odors, and stress and anxiety. For example, many residents noted: that odors are noticeable inside their homes (more than 2,000 complaints); that they were woken at night due to the odors (more than 600 complaints); and that they did not want to go outside due to the odors (more than 400 complaints). A sampling of specific quality of life impacts include: "It [the odors] is preventing our ability to enjoy our home and community," "We basically cannot enjoy our life," and "We are prisoners in our own smelly home."

16. By April 9, 2021, DHEC was actively investigating the source of the strong odors reported in York and Lancaster Counties. DHEC personnel reported experiencing off-site odors on Highway 5, as it crosses the Catawba River near the facility, and in neighborhoods several miles away, in Rock Hill, Lancaster, and Indian Land, South Carolina.

17. EPA Region 4 also maintains a database to keep track of complaints submitted by residents who live near the facility. During March and April of 2021, EPA logged 310 complaints. Some complaints reported odors and a subset included information on health impacts. The most frequently cited symptoms included in the EPA database were headache (80 complaints), burning eyes (52 complaints), nausea (40 complaints), and throat irritation (20 complaints). These are the same four health impacts that were reported most frequently in the DHEC online database.

18. On April 14, 2021, at 10:00 a.m., EPA met with the Respondent via video conference to discuss the chronology of facility operational changes since Respondent's acquisition of the facility in December of 2018, including the period the facility was shut down between September and November of 2020, and the change from steam stripping the foul condensate stream to biological treatment when the facility restarted operations in November of 2020. EPA asked the Respondent what would be needed to restart the steam stripper, and Respondent committed to looking into this question.

19. On April 15, 2021, while at the facility, EPA discussed with Respondent its foul condensate stream, including diagrams of the point of generation of the foul condensate and the foul condensate operational path through the facility. The EPA again asked the Respondent for information on when it would be able to restart the steam stripper, and the Respondent committed to providing information to EPA by the following week.

20. During the onsite inspection on April 15, 2021, duly authorized EPA Region 4 inspectors wore 4-gas monitors for personal safety that were set to alarm at a low threshold of 10 ppm (10,000 ppb) of hydrogen sulfide. One inspector experienced the following hydrogen sulfide readings with the 4-gas monitor while onsite at the facility:

    a. At 11:07 a.m., on the top of the Post-Aeration Tank, near the guardrail overlooking the tank contents, the 4-gas monitor hydrogen sulfide alarm triggered and read 15.9 ppm (15,900 ppb).

    b. At 12:41 p.m., about 50 feet from Aerator 6, the 4-gas monitor hydrogen sulfide reading was 6.9 ppm (6,900 ppb). The 4-gas monitor also read hydrogen sulfide of 3.1 ppm (3,100 ppb) at 12:49 p.m., and 4.9 ppm (4,900 ppb) at 12:52 p.m.

    c. At approximately 4:47 p.m., a hydrogen sulfide alarm on the 4-gas monitor triggered while the employee was near the Evaporator Tank #1. The above 10 ppm reading wasn't recorded, but shortly after the employee left the area, the 4-gas monitor showed a reading of 6.9 ppm (6,900 ppb).

21. On April 24, 25, 26 and 27, 2021, EPA inspectors also detected hydrogen sulfide from on-site and nearby locations downwind of the facility using the EPA Region 5 Geospatial Measurement of Air Pollution ("GMAP") mobile laboratory described in EPA Other Test Method 33A ("OTM 33A")[1].

---

[1] OTM 33A is available on EPA's website here: https://www.epa.gov/emc/emc-other-test-methods#Other%20Test%20Methods.

22.  Region 5's GMAP uses a spectroscopy analyzer to measure hydrogen sulfide concentrations. The collected data are integrated with global positioning system ("GPS") location information and meteorological parameters, when available, under a common time stamp using the specially designed Mobile Emission Monitoring ("MEM") software to quantify air pollutant concentrations and source trajectories.

23.  Between April 24 and 27, 2021, EPA used the GMAP platform to perform 15 stationary measurements of airborne hydrogen sulfide, one of which was a non-detect measurement. During these events, the GMAP system was not moving and continuously sampled air for durations ranging from five (5) minutes to 129 minutes. Table 1 summarizes the stationary measurement results, except for the non-detect measurement. With one exception, all samples were collected in the morning hours, at various times between 3:30 a.m. and 9:30 a.m. As the exception, the first sample shown in Table 1 was collected in the evening hours, at 7:45 to 8:45 p.m.

Table 1. Stationary Hydrogen Sulfide Sampling Results

| Date | Location | Approximate Distance From Facility[2] | Sample Duration (Minutes) | Hydrogen Sulfide Concentrations (ppb) | |
|---|---|---|---|---|---|
| | | | | Highest One-Second Average | Average Over Sample Duration |
| 4/24/2021 | Highway 5 & Catawba River | 0.38 miles N | 60 | 473.37 | 281.13 |
| 4/24/2021 | Riverside Rd & Confab Ln | 0.67 miles SE | 30 | 14.01 | 3.82 |
| 4/25/2021 | Riverside Rd and Confab Ln | 0.63 miles SE[3] | 62 | 387.41 | 173.22 |
| 4/25/2021 | Facility parking lot | NA | 129 | 66.64 | 6.73 |
| 4/25/2021 | Cobble Stone Way & Sherman Drive (Riverchase Estates) | 1.61 miles NE | 30 | 102.63 | 65.85 |
| 4/25/2021 | Riverside Rd & Quail Point Farm Rd | 0.4 miles SE of WWTP[4] | 34 | 12.25 | 2.64 |
| 4/25/2021 | Cureton Ferry Rd | 0.4 miles N | 47 | 13.16 | 1.73 |

[2] Sample locations are estimated distances from specific unit operations at the facility, such as the holding ponds or the aeration basins.

[3] The EPA Region 5 May 5, 2021 GMAP Report for New Indy Containerboard incorrectly identifies this stationary location as approximately 0.64 miles NE, rather than SE of the facility.

[4] This stationary source sample was taken approximately 0.4 miles southeast of the Catawba Wastewater Treatment Plant.

| 4/26/2021 | Riverside Rd and Confab Ln | 0.64 miles SE | 60 | 943.74 | 669.44* |
| 4/26/2021 | Riverchase Estates Entrance | 1.53 miles SE | 30 | 219.20 | 187.9 |
| 4/26/2021 | Townsend Rd (Riverchase Estates) | 1.64 miles SE | 30 | 193.11 | 110.19 |
| 4/27/2021 | Highway 5 & Catawba River | 0.40 miles N | 30 | 501.82 | 315.19 |
| 4/27/2021 | Catawba Reservation, Iswa Headstart School | 3.56 miles N | 30 | 140.56 | 120.75 |
| 4/27/2021 | NE edge of facility aeration basin | NA | 38 | 3,592.60 | 842.01* |
| 4/27/2021 | NE edge of facility aeration basin | NA | 5 | 3,155.78 | 975.87* |

\* Hydrogen sulfide concentrations greater than acute exposure guidance 1 levels ("AEGL-1").

24. Between April 24 and 27, 2021, EPA used the GMAP platform to collect 84 mobile transect measurements of airborne hydrogen sulfide. On April 24, mobile transect samples were primarily collected during the evening hours (i.e., later than 7:00 p.m.). On the other three sampling dates, mobile transect samples were collected primarily during morning hours.

25. During each mobile transect, duly authorized EPA field personnel drove the GMAP mobile air monitoring vehicle to various locations onsite at the facility and in the surrounding communities, while continuously sampling ambient air for hydrogen sulfide. The duration of mobile transect sampling events varied, as did the distance covered during these sampling events and the speed with which the monitoring vehicle traveled.

26. Table 2 summarizes the mobile transect sampling results.

Table 2. Mobile Transect Hydrogen Sulfide Sampling Results

| Monitoring Area | Number of Mobile Transect Samples with Hydrogen Sulfide Levels in the Selected Concentration Ranges (ppb) | | | |
|---|---|---|---|---|
| | >1,000 | >500 and <1,000 | >100 and <500 | <100 |
| Onsite locations | 7 | 3 | 7 | 5 |
| <1 mile offsite | 0 | 5 | 14 | 11 |
| 1-5 miles offsite | 0 | 0 | 11 | 7 |
| >5 miles offsite | 0 | 0 | 0 | 14 |

27. Table 2 shows that one-second average hydrogen sulfide concentrations greater than 1,000 ppb were observed in seven samples collected within the facility boundary. Hydrogen sulfide concentrations generally decreased with downwind distance from the facility.

28. A common feature among multiple mobile transects collected near the facility was that the sample duration included times with elevated hydrogen sulfide concentrations and times with hydrogen sulfide concentrations between 0 and 10 ppb. This pattern indicates that the GMAP vehicle likely drove through a hydrogen sulfide plume during the corresponding sampling events.

29. The summary in Table 2 is limited to the times when, and locations where, EPA collected the 84 mobile transect samples. Elevated hydrogen sulfide concentrations may have also occurred at times when, and locations where, EPA was not collecting measurements.

30. The same two EPA personnel conducted all four days of the GMAP sampling. The two employees reported experiencing a distinct and strong odor while at the facility and while conducting sampling in offsite areas, including Catawba Indian Nation Reservation, Indian Land, Riverchase Estates, and other surrounding communities. The EPA employees reported noticing odors at the same time as when the GMAP measured airborne hydrogen sulfide. The two employees also reported experiencing headaches, itchy eyes, and nausea while the odor was present, and when hydrogen sulfide was being detected. The employees reported the symptoms as being particularly distressing whenever they sampled at the facility and during the early morning hour-long sampling episode conducted on April 26, 2021. The EPA employees reported that these more distressing symptoms typically resolved within approximately one hour after leaving areas with significant odors.

31. EPA monitored at and around the other potential sources of hydrogen sulfide in the area, the Lancaster and Union County Wastewater Treatment Plants, and detected significantly lower hydrogen sulfide concentrations at those locations, as identified in Table 3.

Table 3. Wastewater Treatment Plant Sampling Results

| Date | Location | Approximate distance from facility[5] | Hydrogen Sulfide Concentrations (ppb) Highest One-Second Average |
|------|----------|------------------|------------------|
| 4/27/2021 | Union County Wastewater Treatment Plant | 10.46 miles N | 10.46 |
| 4/26/2021 | Lancaster Wastewater Treatment Plant | 9.58 miles S | 9.88 |

32. DHEC's April 4, 2021 back trajectory analysis, which is an assessment of the location of an air emitting source using odor complaints and wind direction, and EPA Region 5's May 5, 2021 GMAP Report for New Indy Containerboard facility identify the Respondent's facility as the main, if not only, source of hydrogen sulfide causing the symptoms residents had reported in the surrounding communities.

33. On April 19, 21, and 28, EPA and Respondent exchanged emails regarding restarting the steam stripper.

34. On May 3, 2021, at 9:30 a.m., EPA and Respondent met via conference call to discuss the Respondent's plans to restart the steam stripper. During that conference, the Respondent stated that it was awaiting approval from DHEC to restart the stripper. DHEC provided approval later that day, and Respondent restarted the steam stripper slowly over the night into the day of May 4, 2021. However, the maximum capacity of the steam stripper is approximately 430 gpm of foul condensate, which is inadequate to accommodate the approximately 800 gpm of foul condensate being produced, as reported by Respondent.

35. Epidemiological, experimental, toxicological, and other studies have investigated the relationship between inhalation exposure to hydrogen sulfide and adverse health effects. In 2010, the National Research Council of the National Academies evaluated the state-of-the-science and published AEGLs for hydrogen sulfide. The evaluation reported three tiers of AEGLs. The AEGL-1 concentrations are

---

[5] Sample locations are estimated distances from specific unit operations at the facility, such as the holding ponds or the aeration basins.

defined as "the airborne concentration…of a substance above which it is predicted that the general population, including susceptible individuals, could experience notable discomfort, irritation, or certain asymptomatic nonsensory effects." It is further noted that these effects are transient and reversible after exposures cease.

36. AEGL-1 concentrations are derived for different averaging periods. For hydrogen sulfide, the 10-minute, 30-minute, and 60-minute AEGL-1 concentrations are 750 ppb, 600 ppb, and 510 ppb, respectively. These values were all derived from a study that reported headaches among adults with asthma following acute inhalation exposures to hydrogen sulfide. Stationary sampling results from the GMAP were compared to AEGL-1 concentrations with similar or identical averaging periods, as the stationary measurements may represent exposure concentrations for workers or residents in the areas where samples were collected.

37. As identified in Paragraph 23, Table 1, three of fifteen stationary samples had hydrogen sulfide concentrations greater than AEGL-1, a concentration "above which it is predicted that the general population, including susceptible individuals, could experience notable discomfort, irritation, or certain asymptomatic nonsensory effects."

38. The highest recorded offsite hydrogen sulfide average concentration (669.44 ppb in a 60-minute sample) among the 15 GMAP stationary sampling events occurred on April 26, 2021. This sampling event started shortly after 4:00 a.m., at which point the instantaneous hydrogen sulfide concentration was already greater than 750 ppb, indicating that elevated concentrations occurred for an unknown duration before the sampling period began. The sampling event occurred southeast of the facility, near the location of the Riverchase Estates development. The DHEC online database includes 14 records of odors detected between 4:00 a.m. and 6:00 a.m. on this date, including multiple complaints submitted by residents who live in close proximity to where the GMAP sample was collected. On one street in the Riverchase Estates development, a resident reported that the odor was "causing coughing;" and on

11

another street in this development, residents reported being woken up by the odors and "very intense" odor found throughout a home. Health complaints were also reported by residents who live further away.

39. In addition to the health impacts as identified above, over 40 years ago, EPA determined that sulfur compound air emissions from pulp and paper mills can adversely affect the welfare of the public. Kraft Paper Mills, Standards of Performance for New Stationary Sources, 41 Fed. Reg. 42012 (Sept. 24, 1976) ("TRS [total reduced sulfur] emissions from kraft pulp mills are extremely odorous, and there are numerous instances of poorly controlled kraft mills creating public odor problems … Kraft pulp mills are a major source of TRS compounds …TRS emissions from kraft pulp mills are composed primarily of hydrogen sulfide, methyl mercaptan, dimethyl sulfide and dimethyl disulfide … TRS compounds can have an adverse effect on public welfare … The emissions from each pulp mill surveyed in the study affect an average of 44,000 persons over an area of approximately 100 square miles …").

40. The DHEC online database reports demonstrate that residents near the facility experience many adverse impacts beyond the health impacts identified in this Order, including the notable odor-related quality of life impacts mentioned in Paragraph 15.

41. On May 7, 2021, DHEC issued the Respondent a Determination of Undesirable Levels and an Order to Correct Undesirable Level of Air Contaminants ("DHEC Order"). The DHEC Order requires the Respondent to: conduct a full evaluation of its current operations and processes at the facility to identify potential sources of the odor and elevated levels of hydrogen sulfide on and off facility property; conduct onsite and offsite monitoring of hydrogen sulfide at representative locations approved by DHEC; conduct stack or vent testing of its air emissions; and develop corrective action plans for its air and wastewater emissions. As of the date of the DHEC Order, DHEC had received more than 17,000 complaints about the Respondent on its online database. The DHEC order does not require actions to

immediately address an imminent and substantial endangerment to public health or welfare or the environment.

## CONCLUSIONS OF LAW

EPA concludes the following:

42. Respondent is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e), against whom an Emergency Order may be issued under Section 303 of the Act, 42 U.S.C. § 7603.

43. In its current state, the facility is a "pollution source" or "combination of sources" within the meaning of Section 303 of the Act, 42 U.S.C. § 7603.

44. Hydrogen sulfide is an "air pollutant" within the meaning of Sections 302(g) and 303 of the Act, 42 U.S.C. §§ 7602(g) and 7603.

45. Respondent is "causing or contributing" to the emission of air pollutants within the meaning of Sections 302(g) and 303 of the Act, 42 U.S.C. §§ 7602(g) and 7603, by emitting hydrogen sulfide from the facility into the ambient air.

46. EPA is in receipt of evidence that the facility's operations are emitting hydrogen sulfide into the ambient air, and that operating the facility, as described above, if allowed to continue, is presenting an imminent and substantial endangerment to public health or welfare or the environment.

47. EPA field sampling personnel, DHEC personnel, and the public have reported experiencing symptoms consistent with elevated hydrogen sulfide exposures. Among the EPA field sampling personnel, the health impacts occurred at times when, and locations where, the highest hydrogen sulfide concentrations were measured, and resolved soon after the workers left the areas with noticeable odors. All of this information, combined with the AEGL-1 documented exceedances, provides compelling evidence that emissions from the Respondent's facility are causing adverse public health and welfare impacts among exposed populations.

13

48. By emitting hydrogen sulfide from the facility into the ambient air in levels that result in the human health symptoms described above, and that adversely affect personal comfort and well-being, Respondent is affecting the public health and welfare within the meaning of Sections 101(b), 302(h) and 303 of the Act, 42 U.S.C. §§ 7401(b), 7602(h) and 7603.

49. Issuance of this Order is necessary to assure prompt protection of public health or welfare or the environment because it is not practicable to wait for the commencement of a civil action in United States District Court to assure prompt protection before further air emissions of hydrogen sulfide are released from the facility.

50. The Regional Administrator has found that the hydrogen sulfide air emissions from the facility, as described above, if allowed to continue, is presenting an imminent and substantial endangerment to public health or welfare or the environment, and is therefore appropriate for the issuance of an Order under Section 303 of the Act, 42 U.S.C. § 7603.

51. The Regional Administrator is vested with the authority of the Administrator under Section 303 of the Act, 42 U.S.C. § 7603.

## ORDER

52. Based on the foregoing, and pursuant to Section 303 of the Act, 42 U.S.C. § 7603, in order to abate or prevent an imminent and substantial endangerment to public health or welfare or the environment, the Regional Administrator hereby orders Respondent, its agents, employees, successors, and assigns, to address the endangerment posed by the air emissions of hydrogen sulfide from the facility by not exceeding a facility fence-line average concentration (identified below) as follows:

    a. Within one (1) business day of receipt of this Order, Respondent shall submit to EPA in writing a statement explaining whether Respondent intends to and is able to comply with this Order.

14

b.  Upon receipt of this Order, Respondent must immediately begin taking steps to minimize air emissions of hydrogen sulfide to not exceed a facility fence-line average concentration of 600 ppb over a rolling 30-minute period and 70 ppb over a rolling seven (7) day period (on a daily calendar basis) as established through continuous monitoring. Any exceedance of these facility fence-line concentrations, during the pendency of this Order, shall constitute a violation of this Order.

c.  As soon as possible, but not later than 5:00 p.m. on Tuesday, May 18, Respondent shall provide a draft of the timeline and a detailed summary of the measures to be taken to comply with this Order ("Remedial Plan"). The following elements, at a minimum, shall be included and addressed in the Remedial Plan:

> i.  Proposed procedures for operating the facility to meet the hydrogen sulfide concentrations specified in Paragraph 52.b, and supporting documentation;

> ii.  Proposed Quality Assurance Project Plan for data collection and analysis to determine if Respondent is meeting the fence-line hydrogen sulfide concentrations specified in Paragraph 52.b, and supporting documentation; and

> iii.  Proposed plans for addressing safety procedures, shutdown procedures, and access restrictions while work is performed, and supporting documentation.

d.  As soon as possible, but not later than twelve noon on Monday, May 24, Respondent shall submit the final Remedial Plan, addressing any comments received from EPA on the draft Remedial Plan, to EPA for review and approval.

e.  As soon as possible, but not more than five (5) calendar days after receipt of EPA approval under paragraph 52.d., Respondent shall act in accordance with the Remedial Plan, as amended by comments received by EPA. If conditions require Respondent to modify the

15

final approved Remedial Plan, Respondent shall contact EPA immediately, and shall submit a proposed modification for EPA review and comment. Respondent shall not implement any modifications until receiving written EPA approval.

f.  As soon as possible, but no later than 14 calendar days after receipt of this Order, Respondent shall install, and begin operating, continuous hydrogen sulfide fence-line monitors at the three locations identified in Attachment A. The locations may be adjusted with prior written approval by EPA. The monitors shall have a minimum detection limit of 10 ppb by volume (ppbV) or lower, shall have a span range up to 1,000 ppbV or higher, and shall be operated in accordance with the manufacturer's recommendations.  The monitors shall also be equipped with wind speed and wind direction monitors. If the Respondent is already operating ambient air monitors for hydrogen sulfide on or offsite, Respondent shall provide to EPA daily documentation of such monitoring until such time as the monitoring required by this Paragraph is installed and operational. Nothing in the previous sentence shall be interpreted to extend the 14-calendar-day time frame specified above.

g.  As soon as 24 hours of the fence-line monitoring data is available, Respondent shall: submit to EPA daily documentation of the previous 24 hours of monitoring data; immediately notify EPA (via email) of any exceedance of the fence-line hydrogen sulfide concentrations specified in Paragraph 52.b; and submit to EPA a summary report every seven (7) days documenting the results of the continuous monitoring required by Paragraph 52.b.

h.  If Respondent intends to continue manufacturing operations at the facility following implementation of the Remedial Plan, no more than 45 calendar days after receipt of this Order, Respondent shall, after consulting with a toxicologist, submit to EPA in writing a long-term plan that identifies: (i) how Respondent's continued operations will avoid the endangerment identified by EPA in this Order; and (ii) what operational, production or

16

process changes to the facility are necessary to operate in accordance with recognized and generally accepted good engineering and good air pollution control practices.

i.  Unless otherwise required by this Order, Respondent shall submit all notices, schedules, work plans, analyses, certifications and documentation (collectively, "notices") required by this Order to EPA through the CDX electronic system. Respondent shall register for the CDX electronic system and upload such notices at *https://cdx.epa.gov/epa_home.asp*.  Any notice that cannot be uploaded, shall be transmitted via email, and if it cannot be transmitted via email, shall be provided in writing (and if any attachment is voluminous, it shall be provided on a disk, hard drive, or other equivalent successor technology) to the addresses below:

> Kevin Taylor
> Environmental Engineer
> Air Enforcement Branch
> Enforcement and Compliance Assurance Division
> U.S. Environmental Protection Agency, Region 4
> 61 Forsyth Street, S.W.
> Atlanta, Georgia 30303
> Taylor.Kevin@epa.gov

> and

> Marirose J. Pratt
> Associate Regional Counsel
> Air & EPCRA Law Office
> Office of Regional Counsel
> U.S. Environmental Protection Agency, Region 4
> Sam Nunn Atlanta Federal Center
> 61 Forsyth Street, S.W.
> Atlanta, Georgia  30303
> Pratt.marirose@epa.gov

## ACCESS

53.  Respondent shall allow EPA and its authorized representatives and contractors to enter and freely move about all areas subject to this Order, using equipment to gather information, for the purposes of inspecting conditions, activities, records, and contracts related to the presence of hydrogen

17

sulfide at the facility and operation of the facility. Respondent shall allow EPA and its authorized representatives to enter the areas subject to this Order to inspect and copy all records, files, photographs, documents, sampling and monitoring data, and other writings related to carrying out this Order.

54. Nothing in this Order is intended to limit, affect, or otherwise constrain EPA's rights of access to property and records pursuant to applicable law.

## **RESERVATION OF RIGHTS**

55. EPA reserves the right to take any necessary action to enforce this Order, including obtaining injunctive relief or civil or criminal penalties, in accordance with Section 113 of the CAA, 42 U.S.C. § 7413.

56. Be advised that issuance of this Order does not preclude EPA from electing to pursue any other remedies or sanctions authorized by law that are available to address these and other violations. This Order does not resolve Respondent's liability for past violations of the Act or for any violations that continue from the date of this Order up to the date of compliance. At any time after the issuance of this Order, EPA may take any or all of the following actions: issue a further order requiring compliance with the Act; issue an administrative penalty order or bring a civil or criminal action seeking an injunction and penalties for each violation of this Order. *See* Sections 113(a)-(d) of the CAA, 42 U.S.C. §§ 7413(a)-(d); 40 C.F.R. Part 19; and 85 Fed. Reg. 83818 (Dec. 23, 2020).

57. Nothing in this Order shall limit the power and authority of EPA to take, direct or order all action necessary to protect public health or welfare or the environment to prevent, abate or minimize an imminent and substantial endangerment resulting from the emissions into the ambient air of hydrogen sulfide from the facility and operation of the facility. Further, nothing in this Order shall be construed to prevent EPA from seeking legal or equitable relief to enforce the terms of this Order, or from taking other legal or equitable action as EPA deems appropriate and necessary, pursuant to the CAA, and any

other applicable law. Nothing herein shall be construed to prevent EPA from requiring Respondent to perform further actions pursuant to the CAA or other applicable law.

58. Neither EPA nor the United States, by the issuance of this Order, assumes any liability for any acts or omissions by Respondent or Respondent's employees, agents, contractors or consultants engaged to carry out any action or activity pursuant to this Order; nor shall EPA or the United States be held as a party to any contract entered into by Respondent or Respondent's employees, agents, contractors or consultants engaged to carry out the requirements of this Order.

## EFFECTIVE DATE

59. This Order is effective immediately upon issuance by EPA. Although this Order is effective immediately, Respondent may contact EPA to confer about compliance with the Order by contacting Kevin Taylor of my staff at 404-562-9134.

60. This Order shall be effective for a period of not more than 60 days unless the United States files a civil action in the appropriate United States district court pursuant to Section 303 of the Act, 42 U.S.C. § 7603.

John Blevins
Acting Regional Administrator
Region 4
United States Environmental Protection Agency
Sam Nunn Atlanta Federal Center
61 Forsyth Street, SW
Atlanta, GA 30303-8960

5 · 13 · 2021
Date



H2S Monitor Locations

Attachment A

Legend
H2S Monitor

Catawba

H2S Monitor
H2S Monitor 1
H2S Monitor

[1] New Indy may request no later than May 17, 2021 approval for an alternative location representative of fence line monitoring.

Google Earth

4000 ft